719 So.2d 524 (1998)
NURSING ENTERPRISES, INC., Plaintiff-Appellant,
v.
Susan Elizabeth MARR, et al., Defendants-Appellees.
No. 30776-CA.
Court of Appeal of Louisiana, Second Circuit.
August 19, 1998.
*526 Blackman & Perkins, L.L.C. by Gordon N. Blackman, Jr., A. Michelle Perkins, Shreveport, for Plaintiff-Appellant.
Schober, Reynolds & Antee by Kenneth R. Antee, Jr., Shreveport, for Defendants-Appellees.
Before BROWN, CARAWAY and PEATROSS, JJ.
PEATROSS, Judge.
In this suit for damages resulting from unfair trade practices in violation of LSA-R.S. 51:1401, et seq., a jury found that Defendant Susan Marr ("Susan") had committed unfair trade practices; that Plaintiff Nursing Enterprises, Inc. ("Nursing") made defamatory statements about Defendant Alan Marr ("Alan") in its petition; and that a temporary restraining order requested by Nursing was wrongfully issued. The jury awarded $18,000 to Nursing for the unfair trade practices by Susan; $9,000 to Alan for the defamation by Nursing; and $15,000 to Lifeline Nursing Company ("Lifeline") for the wrongful issuance of the TRO. The trial judge entered judgment in accordance with the jury's verdict and assessed 20% of the costs to Susan and 80% to Nursing. Nursing appeals the judgment of the trial court assigning as error the failure of the jury to award Nursing attorney fees against Susan, the inadequacy of the $18,000 award against Susan for her alleged unfair trade practices, the finding that Nursing defamed Alan in its petition and the finding of actual damages suffered by Lifeline as a result of the issuance of the temporary restraining order. Susan assigns as error the jury's finding that she committed unfair trade practices against Nursing. For the following reasons, we amend, affirm in part, reverse in part and render judgment.

FACTS
After moving to Shreveport in 1990 so that Alan, her husband and a medical doctor, could take a job at the Veteran's Administration Hospital, Susan began working for Willis-Knighton Medical Center as a per diem nurse. In November 1990, Susan began working for Nursing as its regional director. Nursing is a nurse staffing business that provides registered and licensed nurses to hospitals and other health care providers. Susan's job was to develop business relations with clients, recruit staff nurses and match these nurses with clients to fulfill the clients' staffing needs. Susan hired Carla Whitehead ("Carla") as Nursing's Clinical Director for the Shreveport office. Susan and Carla executed covenants not to compete with Nursing for a period of one year after termination of employment within a seventy-mile radius of the Shreveport office, and confidentiality agreements.
After some confusion regarding a possible promotion for Susan, she tendered her letter of resignation to Lanny Bernhardt, Nursing's vice president, stating that her final day of employment would be May 30, 1994. Due to her mother's illness, however, Susan's last day of employment with Nursing was May 20, 1994. In addition, Carla was requested by Nursing to tender her resignation and Carta's last day of work for Nursing was May 6, 1994.
Susan testified that on the night of May 6, 1994, she and Alan seriously discussed the formation of a new company to be called Lifeline. On May 9, 1994, Alan executed a lease for office space to house the new company and on May 14, Susan and Carla traveled *527 to Dallas to purchase office furniture. On May 18, 1994, a telephone was installed in the new office. During this time, Alan was allegedly consulting with his attorney about the incorporation of Susan's company, Lifeline. The Articles of Incorporation of Lifeline were executed by Susan on May 26, 1994. Susan hired Carla as vice president; and on June 12, 1994, Lifeline began staffing nurses for clients, which included former Nursing client Willis-Knighton Medical Center. Lifeline was in direct competition with Nursing, Susan's former employer. During July 1994, Lifeline's first full month of staffing nurses, the corporation's gross receipts equaled $97,569.50.
On June 10, 1994, Nursing filed suit against Susan, Alan, Carla and Lifeline requesting that a temporary restraining order and preliminary and permanent injunctions be issued to enjoin Lifeline from directly or indirectly competing with Nursing in accordance with the terms of the covenants not to compete which Susan and Carla executed with Nursing. Nursing also alleged in its petition that all client contracts, office supplies and financial data relating to operations of Nursing had been removed from the Shreveport office by unknown persons. Finally, Nursing sought damages resulting from the breach of the covenants not to compete.
A temporary restraining order was issued that same day prohibiting Defendants "from directly or indirectly soliciting any clients of Nursing Enterprises, Inc., within seventy-five (75) miles of the Shreveport office of Nursing...." Defendants answered the petition and in their reconventional demand sought damages for the wrongful issuance of the temporary restraining order.
On June 27, 1994, Alan and Lifeline filed a Peremptory Exception of No Cause of Action based on the covenants not to compete. On July 18, 1994, Nursing filed its First Supplemental and Amending Petition alleging that Susan and Carla Whitehead had violated the confidentiality agreements which both had entered into with Nursing and that the Defendants' activities were in violation of LSA-R.S. 51:1432 and 51:1401, et seq. By judgment dated July 28, 1994, the trial court dismissed with prejudice the requests for preliminary and permanent injunctions and also sustained the Exceptions of No Cause of Action filed by Alan and Lifeline with regard to Nursing's claims on the covenant not to compete agreements.
On December 8, 1994, Defendants filed an Answer and Reconventional Demand to Plaintiff's First Supplemental Petition. Alan alleged that Nursing had made defamatory statements about him in its original petition. Alan specifically pointed to the allegations that files and documents were missing from the Nursing office and that he was observed at Nursing's business premises on June 4, 1994, when the office was closed. Alan sought damages as a result of this defamation.
On March 27, 1996, Defendants moved for summary judgment alleging that the covenants not to compete were invalid and, therefore, Nursing had no cause of action. By judgment dated May 6, 1996, and amended judgment dated June 18, 1998, the trial court found that the covenants not to compete signed by Susan and Carla were "null and void ab initio" and dismissed all of Nursing's causes of action in contract. The amended judgment reserved all of Nursing's actions under the Louisiana Unfair Trade Practice and Consumer Protection Law. There was no appeal from either of these judgments.
After a four-day trial, the jury returned the verdict discussed above. The trial court entered judgment in accordance with the jury's verdict on March 8, 1997. Since we find merit in Susan's argument that the jury erred in finding she committed unfair trade practices, we will begin our discussion with this issue.

DISCUSSION

Unfair Trade Practices
LSA-R.S. 51:1405 states, in pertinent part:
A. Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.
*528 Acts which constitute unfair or deceptive practices are not specifically defined, but are determined on a case-by-case basis. Conduct is considered unlawful when it involves fraud, misrepresentation, deception, breach of fiduciary duty or other unethical conduct. United Group of Nat. Paper Distributors, Inc. v. Vinson, 27,739 (La.App.2d Cir.1/25/96), 666 So.2d 1338; Wyatt v. P02, Inc., 26,675 (La.App.2d Cir.3/1/95), 651 So.2d 359. A defendant's motivation is a critical factor; the actions must have been taken with the specific purpose of harming the competition. United Group, supra; Monroe Medical Clinic, Inc. v. Hospital Corporation of America, 622 So.2d 760 (La.App. 2d Cir.1993).
In determining what constitutes unfair competition, the court must balance the right of the employee to individual freedom on the one hand and the right of the employer to honest and fair competition and to protection of business assets and property in the nature of trade secrets on the other hand. Generally, however, in the absence of a contrary agreement, an employee is free to compete with a former employer. Wyatt, supra; National Oil Service of Louisiana, Inc. v. Brown, 381 So.2d 1269 (La.App. 4th Cir.1980).
This court stated in United Group, supra:
Without a restrictive agreement, at the termination of her employment, an employee can go to work for a competitor or form a competing business. Even before termination, the employee can seek other work or prepare to compete, except that she may not use confidential information acquired by her from her previous employer. As noted by the court in Wyatt, supra, an employee's involvement in forming a competitive entity, including the solicitation of business and the hiring of employees, prior to terminating her current employment relationship, is not an unfair trade practice.
In addition, the solicitation of customers after the end of an employment relationship does not form the basis for a claim of unfair competition. United Group, supra. Further, a former employee who enters business in competition with her former employer necessarily utilizes the experience she acquired and the skills she developed while in her former employment. United Group, supra; National Oil Service, supra.
Competition and free enterprise are favored. As long as conduct is neither unlawful nor offensive to public policy, persons are able to discuss changes of employment, effectuate a change in employment, plan to compete and take preliminary steps in furtherance of that plan. Orkin Exterminating Company v. Foti, 302 So.2d 593 (La.1974); United Group, supra.
In its First Supplemental and Amending Petition, Nursing alleged that Defendants acquired trade secrets, namely client lists, employee lists, client business agreements, rate sheets, financial statements and other financial information, through improper means and, thereby, breached their fiduciary duty and used the information for their own financial benefit. Nursing also alleged that Susan and Carla, both prior to and after termination of their employment, contacted employees and clients of Nursing in attempts to "take all or substantially all of [Nursing's] business with their sole interest of causing damage to [Nursing]." According to Nursing, these actions were in violation of the Unfair Trade Practices and Consumer Protection Law.
Susan contends that Nursing presented no evidence that she had the specific intent of harming Nursing through the formation and operation of Lifeline. In addition, Susan claims Nursing did not show that Susan's actions amounted to unfair trade practices. We agree that Nursing failed to show specific intent to harm or that any of Susan's acts involved fraud, misrepresentation, deception, breach of fiduciary duty or other unethical conduct.
Nursing's first claim of unfair trade practices is based on allegations that Susan violated her fiduciary duty to her employer by using information which constituted trade secrets in her efforts to form and operate a competing business entity. Nursing not only alleges that Susan used information gained through her work experience with the company, but also alleges that certain documents *529 were missing from the Shreveport office and, by implication, that these documents were used by Susan.
Nursing presented no evidence at trial to show that any property was missing from its Shreveport office, or that Susan took such property. We note that Nursing attached to its original petition the affidavit of Carolyn McDaniel who attested to the missing property. Ms. McDaniel, however, did not testify at trial. In fact, Elizabeth Regard, the person Nursing hired to replace Susan, testified that nothing was missing from the office. Ann Peters, Nursing's former staffing coordinator, testified that no files were missing from the office and that she saw Susan leave the office on her final day of employment with only personal belongings. Finally, Susan, Alan and Carla all stated that they never removed any property belonging to Nursing from the Shreveport office.
Since the evidence does not show that Susan physically misappropriated any alleged trade secrets of Nursing, we must next determine if Susan misappropriated information considered to be trade secrets which she obtained during her employment with Nursing. The burden is on Nursing to show that it had a legally protectable secret which was misappropriated by Susan in violation of a confidential relationship. United Group, supra; Engineered Mechanical Services, Inc. v. Langlois, 464 So.2d 329 (La.App. 1st Cir. 1984), writ denied, 467 So.2d 531 (La.1985). Whether something constitutes a trade secret is a question of fact. United Group, supra; Wyatt, supra. As stated above, a former employee who enters business in competition with her former employer necessarily utilizes the experience she acquired and the skills she developed while in her former employment.
The evidence shows that Susan did not violate her fiduciary duty to Nursing by using its trade secrets in the formation and operation of Lifeline. In fact, the information Nursing alleges Susan misappropriated does not qualify as trade secrets. As for nurse lists, the evidence shows that Susan and Carla had a personal relationship with many of these nurses and one could expect the nurses to follow Susan if they were being treated well by her and the company with which she was associated. In addition, these nurses were not exclusive to one agency. The testimony showed that nurses usually signed on with more that one agency to ensure they had consistent work. Finally, Susan testified that she was a member of an organization through which she could receive a list of all nurses in the state of Louisiana.
Nursing claims that Susan used either client lists or the relationships established with clients during her employment with Nursing to lure those clients, especially Willis-Knighton Hospital, to do business with Lifeline. As stated by Susan, the names and numbers of the hospitals and other medical providers is easily accessible through the local telephone book. Susan also stated that when she began Lifeline, she went to Willis-Knighton Hospital, which is where she first worked when she came to Shreveport. She also contacted Lincoln General Hospital where Carla worked prior to her employment with Nursing. Finally, the fact that Susan solicited Nursing's clients is not an unfair trade practice, and there is no evidence that Susan solicited these clients prior to terminating her employment with Nursing.
Nursing also claims that Susan misappropriated information related to nurses' salaries and client charges. Again, even if proven to be true, this information does not constitute trade secrets. The testimony shows that nurses routinely volunteered how much they were being paid by an agency. Susan testified that she and other agency directors exchanged information and that the hospitals would release information relating to other agencies' charges in an effort to get a better contract price from her.
The evidence in the present case shows that Susan began working at Nursing's Shreveport office and built the business into a great money-making operation. Through her personal service to the nurses and clients, the Nursing office thrived. When she left Nursing to open her own business, she continued these same business practices and maintained the relationships with the nurses and clients in the spirit of competition. In accordance with the jurisprudence, *530 Susan's efforts in establishing her business, i.e., renting office space, buying furniture, installing a telephone and executing articles of incorporation, do not amount to unfair trade practices. Nursing has not shown that Susan was attempting to intentionally harm her former employer in any way. The jury was clearly wrong in concluding that Susan had participated in unfair trade practices. We, therefore, reverse that portion of the judgment awarding Nursing $18,000 for Susan's alleged unfair trade practices and render judgment in favor of Susan. Our conclusion on this issue pretermits a discussion of whether Nursing is entitled to attorney fees or whether the jury's award to Nursing was adequate.

Defamation of Alan
The five essential elements of defamation are defamatory words, publication, falsity, malice and resulting injury. If even one of these elements is absent, the cause of action fails. Defamatory words are defined as words which tend to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating with him. To be actionable, the words must be communicated or published to someone other than the plaintiff. Words which expressly or implicitly accuse another of criminal conduct or which, by their nature, tend to injure one's personal or professional reputation are considered defamatory per se. If the plaintiff proves publication of defamatory per se words, the elements of falsity and malice are presumed although they may be rebutted by the defendant. Injury is also presumed. If the words are not defamatory per se, the plaintiff must prove (in addition to defamatory meaning) publication, falsity, malice and injury. Malice, the lack of a reasonable belief in the truth of the statement, may sometimes be inferred from the surrounding circumstances. Injury may include nonpecuniary or general damages such as injury to reputation, personal humiliation, embarrassment and mental anguish even when no special damage, such as loss of income, is claimed. Kosmitis v. Bailey, 28,585 (La.App.2d Cir.12/20/96), 685 So.2d 1177.
Nursing argues that its petition does not allege that Alan committed a crime and, therefore, Alan had the burden of proving all the elements of defamation. Nursing further contends that Alan failed to prove actual or implied malice on the part of Nursing. Alan claims that Nursing's petition does accuse him of committing a crime and, therefore, malice is presumed.[1] Even assuming, arguendo, that Nursing's petition accused Alan of committing a crime, we conclude that Nursing rebutted the presumption of malice by showing it had a reasonable belief in the truth of the statement.
Nursing's petition states, in pertinent part:
10)
An inspection of the Shreveport office of NURSING ENTERPRISE, INC., located at 820 Jordan Avenue, Suite 507, revealed that all client contracts, office supplies and financial data relating to operations of NURSING ENTERPRISE, INC., had been removed from the premises by persons unknown.
* * *
12)
... Further, Defendant Alan B. Marr was observed at the business premises of Nursing Enterprise, Inc., on Saturday, June 4, 1994, between the hours of 1:00 p.m., and 4:30 p.m. The office was closed at the time.
The evidence showed that Alan was in fact on the business premises on the alleged date. Nursing relied on sign-in sheets maintained by building security where Nursing's Shreveport office was located. The sign-in sheets, which were introduced into evidence by Nursing, show that on June 6, 1994, at 1:58 p.m., Alan was signed in to go to office number 507, which was shown to be Nursing's office.
*531 Alan showed that he was on the premises on this date, but to visit a friend who also had an office in the building. The sign-in sheet shows that this friend signed in immediately prior to Alan at 1:58 p.m. Alan's friend testified that the two men went to his office, suite 480, and visited. Alan also showed that the guard at the front desk would often sign people in and record their destination as the suite which they normally visited.
This information, however, was not available to Nursing when it filed the original petition. From an examination of the sign-in sheet, it appears that Alan went to Nursing's office on June 4, 1994. As such, Nursing had a reasonable belief in the truth of the statement made and, therefore, the presumption of malice is rebutted. We conclude, therefore, that the jury was manifestly erroneous in finding that Nursing had defamed Alan and we reverse that portion of the judgment awarding $9,000 to Alan and render judgment in favor of Nursing.

Actual Damages for TRO
At the outset, we note that a determination of damages for the wrongful issuance of a temporary restraining order is more properly a question for the trial judge. None of the parties have raised as error the fact that the jury determined whether the TRO was wrongfully issued and the amount of damages. Since the trial judge previously determined that the covenant not to compete agreements were invalid and no appeal was taken from that judgment, and because we hold herein that Susan did not commit unfair trade practices, it necessarily follows that we conclude the temporary restraining order was improperly issued. The record before us is sufficient for us to determine what damages are proper; and, therefore, in the interest of judicial efficiency and fundamental fairness to the parties, we utilize our supervisory powers to consider this case at this time. North Central Utilities, Inc. v. East Columbia Water District, 516 So.2d 1268 (La.App. 2d Cir.1987).
La. C.C.P. art. 3608 states, in pertinent part:
The court may allow damages for the wrongful issuance of a temporary restraining order or preliminary injunction on a motion to dissolve or on a reconventional demand.
The word "wrongful" does not necessarily connote bad faith or connivance, but it does impart the infringement of some right. The use of the injunctive process is an extreme remedy and its improper issuance causes the mover to stand the responsibility therefor. Menoah Petroleum, Inc. v. McKinney, 545 So.2d 1216 (La.App. 2d Cir.1989); Sellers v. Barthelemy, 520 So.2d 1219 (La.App. 5th Cir. 1988).
As stated above, Nursing, in its original petition, requested that a temporary restraining order be issued based on Defendants' violation of the covenant not to compete agreements. The TRO was issued as a result of this pleading. Subsequently, the trial court determined that the covenant not to compete agreements were null and void. As stated above, there was no appeal from this judgment. Nursing filed its First Supplemental and Amending Petition alleging unfair trade practices on the same day that the rule to show cause hearing was held and the agreements were held to be invalid. The trial court reserved any claims of unfair trade practices raised by Nursing in its amended petition. We have held, however, that Susan did not commit any unfair trade practices; and, therefore, if the TRO had been issued on such claim, it would still be wrongfully issued.
At trial, both Carla and Susan testified that upon notice of the issuance of the TRO, they ceased answering their telephones and stopped booking shifts. Lifeline did continue to staff shifts it was responsible for under contracts entered into prior to the issuance of the TRO. Susan testified that at the time the TRO was issued, there were two contracts "up in the air" and she had to call the clients and inform them that Lifeline would not be able to represent them. As a result of the TRO, Susan testified that Lifeline "lost actual volume" because they had to turn away nurses and clients. Lifeline was unable to exercise its right to engage in business due to the TRO. Lifeline has adequately *532 proven actual damages resulting from the issuance of the TRO.
Susan specifically testified that during this period, Willis-Knighton Hospital, Willis-Knighton Rehab, LifeKare Hospital and Lincoln General called Lifeline for staffing, but she had to inform them that Lifeline was unable to provide any services due to the TRO. She further stated that this business would have generated revenues of "a little over sixty-five thousand dollars." Susan testified that $15,000 would adequately compensate her for the TRO and the resulting loss of business. Based on this testimony, we conclude that Lifeline is entitled to $15,000 in damages for the wrongful issuance of the TRO.

CONCLUSION
For the above reasons, we amend the judgment to assess costs to Nursing, affirm that portion of the judgment awarding $15,000 to Lifeline for the wrongful issuance of the TRO and we reverse those portions of the judgment regarding unfair trade practices and defamation and render judgment as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Susan Marr and rejecting the claims and demands of Nursing Enterprises, Inc. related to the issue of unfair trade practices.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that there be judgment in favor of Nursing Enterprises, Inc. rejecting the claims and demands of Alan B. Marr on the issue of defamation.
IT IS FURTHER ORDERED ADJUDGED AND DECREED, that there be judgment in favor of Lifeline Nursing Company and against Nursing Enterprises, Inc. in the amount of fifteen thousand dollars ($15,000) together with legal interest from the date of judicial demand.
IT IS FURTHER ADJUDGED AND DECREED that costs are assessed to Nursing Enterprises, Inc.
AMENDED, AFFIRMED IN PART, REVERSED IN PART AND RENDERED.
NOTES
[1] We note that Defendants admit in their Memorandum In Support of Peremptory Exception of No Cause of Action filed on June 27, 1994, that Nursing's petition does not accuse Alan of removing or stealing any items from Nursing's office.