793 So.2d 327 (2001)
SDT INDUSTRIES, INC., Plaintiff-Appellee-Cross Appellant,
v.
John LEEPER and Chilean Nitrate Corporation, Defendants-Appellants-Cross Appellees.
No. 34,655-CA.
Court of Appeal of Louisiana, Second Circuit.
June 22, 2001.
Rehearing Denied August 16, 2001.
*328 Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P. by A. Justin Ourso, III, David M. Kerth, Claiborne P. Tanner, Baton Rouge, Counsel for Chilean Nitrate Corporation.
Cotton, Bolton, Hoychick & Doughty by John Hoychick, Jr., Rayville, Counsel for John Leeper.
Preis, Bergeron & Gordon by Phillip W. Preis, Baton Rouge, Charles M. Gordon, Jr., Samuel T. Singer, Winnsboro, Counsel for SDT Industries, Inc.
Before STEWART, GASKINS and KOSTELKA, JJ.
GASKINS, J.
In this case involving manufacturers in the fertilizer industry, the two defendantsa former employee of the plaintiff manufacturer and the competitor for whom he subsequently went to work-contend that the jury erred in finding that they engaged in unfair trade practices and misappropriated trade secrets. They contest the damage award in excess of $1 million to the plaintiff and also assert that the trial judge erred in instructing the jury and in denying their motions to set aside or modify the jury verdict. The plaintiff also appeals, arguing that the trial court awarded inadequate attorney fees and inadequate damages on the unjust enrichment claim. For the reasons set forth below, we reverse and render.

FACTS
SDT Industries, Inc., manufactures a water soluble fertilizer (WSF) in Winnsboro, *329 Louisiana. In addition to marketing its own "Total Gro" brand, it also "toll blends" fertilizer for other companies which market the resulting products under their own names. SDT's president and managing owner is A.A. "Skip" Wolleson.
Defendant John Leeper was hired by SDT in 1989 as a salesman. During his eight years at SDT, Leeper was a key employee. He computerized the business. When Wolleson was periodically stricken with a serious illness, Leeper ran the business with assistance from the plant manager. Through Leeper's efforts, Chilean Nitrate Corporation (Chilean) became a supplier of potassium nitrate, a necessary fertilizer ingredient. Through his own initiative, he also eventually secured Chilean as a customer of SDT's toll blending service.
Chilean is the American subsidiary of SQM, a natural resources company with headquarters in Chile. According to the testimony produced at trial, it is the largest producer of potassium nitrate in the world. SQM, which successfully manufactured fertilizer in Europe, wished to enter the American market through Chilean. An initial step in this process was to have an American company toll blend a fertilizer for Chilean; the company planned to eventually have a manufacturing facility in the United States.
SDT toll blended for Chilean from February 1996 to October 1997. It produced two brands of fertilizer for Chilean, Bulldog and Champion. In March 1996, Chilean proposed to Wolleson that it and SDT enter into a long-term contract or a joint venture. While the joint venture was under discussion, Chilean sent a letter to SDT suggesting that SDT would lose business if Chilean became a competitor. During the course of these various discussions, Wolleson sent Chilean certain SDT financial information. Instead of a joint venture, they entered into a toll blending contract.
At various points, Chilean unsuccessfully approached Leeper about coming to work for it. Eventually, the relationship between Leeper and Wolleson became strained, and Leeper began to feel that, despite his contributions to SDT's success, his place at SDT was no longer secure. In approximately the summer of 1997, Leeper approached Kevin Keenan at Chilean about employment. He received a letter from Keenan dated August 12, 1997, offering employment as specialty products manager for Chilean. Leeper accepted the Chilean job on August 20, 1997, and tendered his resignation to SDT.
Thereafter, SDT and Chilean discussed the possibility of a sale of SDT to Chilean in 1997. In furtherance of these discussions, Wolleson again supplied Chilean with SDT's financial information. However, negotiations were ultimately unsuccessful. In October 1997, Wolleson cancelled SDT's toll blending contract with Chilean. As a result, Chilean was forced to swiftly make arrangements with other toll blenders to continue making their products.
In December 1997, SDT filed the present suit against Leeper and Chilean, alleging violations of the Louisiana Uniform Trade Secrets Act, La. R.S. 51:1431, et seq., and the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401, et seq. SDT claimed that Leeper had given Chilean trade secrets belonging to SDT; these allegedly included, among other things, equipment lists and product formulas.
In early 1999, Chilean opened its own WSF plant in Jackson, Mississippi. The design of the Chilean plant was adapted from a plant in Georgia and did not resemble the SDT plant.
*330 In April 2000, a jury ruled in favor of the plaintiff on both the trade secrets and unfair trade practices claims. On its verdict form, the jury specifically found the following: SDT possessed trade secrets; Leeper and Chilean misappropriated those trade secrets; Leeper disclosed SDT's trade secrets to Chilean; Chilean used SDT's trade secrets; SDT suffered damage or Chilean and Leeper were unjustly enriched as a result of the misappropriation, disclosure, and use; the loss awarded against Chilean was $500,000.00 but nothing against Leeper; the unjust enrichment awarded against Chilean was $500,000.00 but nothing against Leeper; the misappropriation was wilful and malicious; Chilean was a business competitor of SDT; Leeper and Chilean used unfair trade practices against SDT; SDT suffered damages resulting from the unfair trade practices; and the amounts that would reasonably compensate SDT for the unfair trade practices were $100,000.00 against Leeper and $350,000.00 against Chilean.
Judgment was signed awarding damages to SDT of $1.35 million against Chilean ($1 million on the trade secrets claim and $350,000.00 on the unfair trade practices claim). Also, damages of $100,000.00 were awarded to SDT against Leeper on the unfair trade practices claim. On the issue of attorney fees, the court ruled that none were owed under the Louisiana Uniform Trade Secrets Acts; however, it awarded $150,000.00 in attorney fees to SDT against the defendants under Louisiana Unfair Trade Practices and Consumer Protection Law.
Subsequent defense motions for JNOV, new trial and remittitur were denied, as was the plaintiff's motion for JNOV.
All parties appealed.

STANDARD OF REVIEW
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Reversal of findings of fact on appeal requires that (1) the appellate court find from the record that no reasonable factual basis exists for the trial court's finding, and (2) the appellate court determine that the record establishes the finding is clearly wrong or manifestly erroneous. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La. 1993).
La. C.C.P. art. 1811 sets forth the rules governing a motion for judgment notwithstanding the verdict (JNOV). The JNOV questions whether the jury verdict, as a matter of law, is supported by any legitimate or substantial evidence. To find that the evidence was insufficient as a matter of law requires that there be no valid line of reasoning or permissible inferences which could lead rational men and women to the conclusion reached by the jury. Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991); United Group of National Paper Distributors, Inc. v. Vinson, 27,739 (La.App.2d Cir.1/25/96), 666 So.2d 1338, writ denied, 96-0714 (La.9/27/96), 679 So.2d 1358. In reviewing the trial court's determination regarding whether to grant a JNOV or new trial, the appellate court's review is limited to whether the trial court committed manifest error in its denial of the motions. Gibson, supra; United Group, supra.

TRADE SECRETS
Whether something constitutes a trade secret is a question of fact. Wyatt v. PO2, Inc., 26,675 (La.App.2d Cir.3/1/95), 651 So.2d 359, writ denied, 95-0822 *331 (La.5/5/95), 654 So.2d 331. The threshold inquiry is whether any legally protectable information exists. A trade secret is information that has independent economic value because it is not generally known or readily ascertainable and efforts are taken to maintain the information's secrecy. Wyatt, supra.
La. R.S. 51:1431(4) of the Uniform Trade Secrets Act sets forth the following definition:
(4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
(a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Discussion
The evidence before us demonstrates that the so-called "trade secrets" of SDT did not fall within the statutory definition of that term.
The testimony of the witnesses demonstrates that very little in the WSF business qualifies as a "trade secret." State laws, by varying degrees, require disclosure of a fertilizer's ingredients on its package. Duplication of another company's non-patented formulas is commonplace. (Patents in the WSF field are almost nonexistent.) As to some ingredients, there are few suppliers. Information on fertilizer manufacture is available from a variety of resource materials. All WSF plants require the same basic equipment.

Equipment list
SDT contends that Leeper gave Chilean its equipment list which was a trade secret. However, the list supplied by Leeper to Chilean was essentially a "wish list" of the equipment that he thought a WSF plant should ideally have. There were items on the list which were not in the SDT plant. Also, as noted previously, all WSF plants would require basically the same equipment. Finally, a list of almost all of the SDT equipment had previously been registered in the public records under a UCC 1 filing. The only item not on the UCC list was SDT's dehumidification equipment. However, SDT's use of this equipment was not unique in the industry. Information on this dehumidification equipment was readily available from a number of sources including trade publications.[1] Dr. Paul King, a highly qualified defense expert witness who had toured many WSF plants, including the SDT plant, testifiedwithout contradiction that there was nothing unique or especially superior about the equipment or manufacturing process at the SDT plant.
At any rate, the layout of the new Chilean plant in Jackson did not resemble the SDT plant in any fashion. To the contrary, the architect hired by Chilean designed it to be almost identical to a dry fertilizer mixing plant he had previously done in Georgia.

Secret ingredients
SDT maintained that its use of petro ag and citric acid as additives in its fertilizer was a trade secret. However, the testimony revealed that these ingredients have been well known in the WSF industry for *332 some time. Interestingly, there was some question as to their effectiveness. While Leeper was at SDT, he discontinued their use because he questioned their utility. After he left, SDT restored their use.
In conjunction with this argument and the equipment list claims, we note that the evidence established that tours of plants are not unusual. Although Wolleson testified that tours of the SDT plant were rarely given and that employees were instructed to cover up their "secret ingredients" while non-employees were on the premises, other testimony demonstrated that while Leeper was at SDT, tours were given about once a month and that prospective customers were allowed to see all aspects of production as a marketing technique to convince them to use SDT. Dr. King, the defense expert, testified that he had toured the SDT plant as a prospective customer twice before the events in the present lawsuit arose. The first time he was given the tour by Wolleson himself, who gave him access to all parts of production, answered all of his questions, and did not require him to sign a confidentiality agreement. The same was true later when Leeper gave Dr. King a tour of the plant.
Several of Chilean's executives testified without contradiction that they were routinely allowed to tour the plants of other WSF companies and that they discussed industry-wide problems with competitors.

Business information
Among other things, SDT claims that its customer list was a trade secret and that Leeper disclosed it to Chilean. However, no evidence substantiates these contentions. Furthermore, the evidence did not show that SDT had lost any customers to Chilean at the time of trial. The companies had different customer bases. Chilean targeted distributors while SDT sold primarily to end-users like greenhouses.
To buttress its contention that it had trade secrets, SDT attempts to bootstrap that argument to matters of "privilege," an entirely different concept. In support of its argument, SDT points to Chilean documents which are marked "confidential" and the confidentiality agreement signed by Leeper when he went to work for Chilean. As adequately explained by several Chilean witnesses, certain internal business matterssuch as pricing and marketing strategies-are deemed confidential prior to being made public. Also, matters under negotiation are considered confidential, as are personnel matters. The fact that these are "confidential" to the company does not magically and automatically elevate them to the status of a "trade secret" as defined by the statute.
After a careful review of the evidence, we hold that it was manifestly erroneously to find that the defendants had violated the Louisiana Uniform Trade Secrets Act. Accordingly, that portion of the judgment is reversed.

UNFAIR TRADE PRACTICES
The Louisiana Unfair Trade Practices and Consumer Protection Law is set forth in La. R.S. 51:1401, et seq. It declares unfair methods of competition, as well as unfair or deceptive acts or practices in the conduct of any trade or commerce, to be unlawful. An act is not required to be both unfair and deceptive. What constitutes unfair and/or deceptive practices is not specifically defined, but is determined on a case by case basis. United Group, supra; Wyatt, supra.
The Unfair Trade Practices Law does not prohibit sound business practices, the exercise of permissible business judgment or appropriate free enterprise transactions. To be unfair, the conduct must offend established public policy. Fraud, *333 deceit and misrepresentation constitute deceptive practices. Monroe Medical Clinic, Inc. v. Hospital Corporation of America, 522 So.2d 1362 (La.App. 2d Cir.1988); United Group, supra. A defendant's motivation is a critical factor; the actions must have been taken with the specific purpose of harming the competition. United Group, supra; Nursing Enterprises, Inc. v. Marr, 30,776 (La.App.2d Cir.8/19/98), 719 So.2d 524.
A practice is unfair when it offends public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Wyatt, supra.
In determining what constitutes unfair competition, the court must balance the right of the employee to individual freedom on the one hand and the right of the employer to honest and fair competition and to protection of business assets and property in the nature of trade secrets on the other hand. Generally, however, in the absence of a contrary agreement, an employee is free to compete with a former employer. National Oil Service of Louisiana, Inc. v. Brown, 381 So.2d 1269 (La. App. 4th Cir.1980); Nursing Enterprises, Inc. v. Marr, supra; Wyatt, supra. In an employer's claim against a former employee alleging misappropriation of a customer list, the following factors are considered: "the manner in which and the purpose for which the customer lists are compiled; the conduct and motivation of the employee before and after the employment relationship ends; the manner in which the customers are contacted after the termination; the nature of the representations made to the customers by the former employee; and the existence of a scheme or an intent to injure or to take over all or a substantial part of the former employer's business." Core v. Martin, 543 So.2d 619 (La.App. 2d Cir.1989); Wyatt, supra; National Oil Service of Louisiana, Inc. v. Brown, supra,
Without a restrictive agreement, at the termination of his employment, an employee can go to work for a competitor or form a competing business. Even before termination, the employee can seek other work or prepare to compete, except that he may not use confidential information acquired by him from his previous employer. An employee's involvement in forming a competitive entity, including the solicitation of business and the hiring of employees, prior to terminating his current employment relationship, is not an unfair trade practice. United Group, supra.
A former employee who enters business in competition with his former employer necessarily utilizes the experience he acquired and the skills he developed while in his former employment. United Group, supra.
Competition and free enterprise are favored. As long as conduct is neither unlawful nor offensive to public policy, persons are able to discuss changes of employment, effectuate a change in employment, plan to compete and take preliminary steps in furtherance of that plan. United Group, supra; Nursing Enterprises, Inc. v. Marr, supra.

Discussion
There is no direct evidence in the record that Leeper gave Chilean any confidential information belonging to SDT. Leeper specifically denied giving any such information to Chilean, and the representatives of Chilean denied receiving it. Nor is there any circumstantial evidence tending to prove that Chilean came into possession of SDT information by nefarious means. We will address certain of SDT's claims individually.

*334 Computers & diskettes

SDT contends that Leeper unscrupulously took back-up diskettes for the SDT computer and in some fashion passed the information on them to Chilean. Leeper testified that he maintained the back-up diskettes for SDT's computers for a number of years and that Wolleson was aware of this fact. (Chris Donnell, an SDT employee, expressed surprise as to Wolleson's claim that he was unaware of the back-up diskettes; her testimony indicated that the back-ups were done regularly and without secrecy.) Leeper also testified that, while employed by SDT, he put the diskettes on his home computer due to the potential frailty of the diskettes, which could easily go bad, rendering the information on them unretrievable. Having this information accessible on his home computer allowed him to perform work for SDT at home. After leaving his employment with SDT, he temporarily kept this information due to the possibility which existed at that time that SDT would be purchased by Chilean. When the home computer became unstable, he put the SDT information on the laptop computer given to him by Chilean. However, Leeper testifiedwithout contradiction that when it became apparent that Chilean would not be buying SDT, he deleted all SDT information and that he threw away the diskettes.
There is no evidence that the SDT information was ever placed on the main Chilean computer. Nor is there any evidence that any of the information on the diskettes was utilized by Chilean in any fashion.
Admittedly, Leeper foolishly placed clipart on his home computer which obscured certain information on it prior to its examination by computer experts. However, Leeper testified that at the time he placed the clip-art on the hard drive, he believed that there was no SDT information remaining on the computer and that he was concerned with his privileged e-mail communication with his attorney and his Chilean work being accessed by the plaintiff. Furthermore, examination of the computers at issue by the defense forensic computer expert tended to corroborate his testimony that no SDT information remained on the computer after December 1997.

SDT financial information
SDT contends that Chilean misused the financial information given to it by SDT when buy-out discussions were under consideration. Instead of utilizing it solely for purposes of evaluating the benefits of purchasing SDT, Chilean is accused of using the information to further its own WSF business. However, the evidence in the record fails to show that the plaintiff carried its burden of proving that Chilean made any inappropriate use of the materials.
Wolleson was interested in selling SDT to Chilean. Originally, there were discussions of a joint venture whereby Chilean would pay SDT's owners 50 percent of its value and the owners would retain 50 percent ownership in the new company; shortly thereafter, Chilean estimated SDT's value as $1.1 million. Wolleson did not communicate that offer to his business partner because he felt it was insultingly low. Thereafter, he bought out his partner's half of SDT for $400,000, becoming sole owner, and continued in his efforts to sell SDT to Chilean for at least $2 million. He gave SDT's financial information to Chilean in order to facilitate a buyout. However, Chilean was unwilling to pay the price set by Wolleson, and no sale was ever consummated.
Although SDT claims that Chilean needed SDT's "know-how" and information in order to successfully compete in the American WSF market, the record does not bear out this assertion. As part of a *335 large international corporation, Chilean had access to the expertise of SQM's highly successful Belgian WSF operations. SQM also had plants in Chile, Abu Dhabi in the United Arab Emirates, and a joint venture in France. By working with its counterpart in Belgium, Chilean was able to develop its own WSF line, which it then took to toll blenderslike SDTfor production. Chilean's plan was to gradually enter the American market, first with tolling while it learned the business and focused on marketing. Once it had sufficient sales, Chilean planned to build its own plant. At trial, Chilean representatives stated that it was planning to build three additional plants in North America. SDT also contends that the reason Chilean's sales improved was due to the superior product SDT produced for it. However, Chilean put on credible evidence that its success during the time SDT toll blended for it was due to marketing factors, such as lowering prices, changing formulations and the colorant, and securing additional distribution in areas Chilean had not previously pursued.

Threats
Wolleson testified that he felt intimidated by language in letters from Chilean's president to the effect that SDT's value would be appreciated by merging with Chilean but depreciated by Chilean's entry into the WSF industry as a competitor. Review of this language reveals nothing legally impermissible. Chilean was pointing out the pros and cons of a business situation. Chilean's president testified that no threat was intended and that he was attempting to merely open negotiations with SDT. (The letter of May 2, 1996, specifically invited further discussions.) Despite this alleged intimidation, Wolleson voluntarily entered into a toll blending contract with Chilean.

Leeper's intent
Additionally we note that the record is devoid of evidence demonstrating an intent by Leeper to harm SDT. In 1994, Chilean offered him employment at a time when Wolleson was in extremely poor health. Leeper's departure at that point in time would have been seriously injurious to SDT. However, Leeper declined the opportunity and chose to stay with SDT. After he accepted Chilean's employment offer in 1997, he gave notice and worked with SDT employees to help them learn his responsibilities in order to case the difficulties caused by his departure. These factors tend to disprove that he bore ill intent toward SDT and intended to do it harm.
We contrast the actions in this case to the deplorably unfair conduct of the defendants in the National Oil Service case. There the defendants pursued "a course of calculated misconduct over a considerable period of time." They diverted business, removed equipment and records, and left the business of their former employer in "complete disarray." They departed without notice and pirated experienced employees. After leaving, they lied to customers of their former employer.
We find that the actions of Leeper and Chilean did not constitute unfair trade practices. The jury's finding that the defendants violated Louisiana Unfair Trade Practices Law was clearly wrong.

CONCLUSION
In view of our determination that the jury's verdict against defendants is based neither in law nor in fact and must be set aside, we pretermit the other assignments of error asserted by the defendants and the plaintiff. We also pretermit consideration of the motion to strike filed by Chilean.
*336 The judgment in favor of the plaintiff is reversed. We render judgment in favor of the defendants, John Leeper and Chilean. Costs of this appeal are assessed against the plaintiff.
REVERSED AND RENDERED.

APPLICATION FOR REHEARING
Before BROWN, STEWART, GASKINS, KOSTELKA, and DREW, JJ.
Rehearing denied.
NOTES
[1] Although Chilean's Jackson plant was initially designed to have dehumidification equipment, by the time of trial Chilean's senior manager for manufacturing WSF had had it removed because it was ineffective.