INNOVATIVE MANPOWER
SOLUTIONS, LLC

v.

IRONMAN STAFFING, LLC, et al.

Civil No. 12–1863.

United States District Court,
W.D. Louisiana,
Lafayette Division.

March 7, 2013.

Blair B. Suire, Robert L. Waddell, Donald W. Washington, Jones Walker et al., Lafayette, LA, for Innovative Manpower Solutions, LLC.

Thomas J. Cortazzo, Stuart G. Richeson, Baldwin Haspel et al., New Orleans, LA, for Ironman Staffing, LLC, et al.

### JUDGMENT

RICHARD T. HAIK, District Judge.

This matter was referred to United States Magistrate Judge C. Michael Hill for Report and Recommendation. After an independent review of the record, including the objections filed herein, this Court concludes that the Report and Recommendation of the Magistrate Judge is correct and adopts the findings and conclusions therein as its own. Accordingly,

**IT IS THEREFORE ORDERED** that the Motion for Preliminary Injunction filed by Innovative Manpower Solutions, L.L.C. [rec. doc. 7] is **DENIED.**

### REPORT AND RECOMMENDATION ON MOTION FOR PRELIMINARY INJUNCTION AND MOTION TO DISMISS SUPPLEMENTAL STATE LAW CLAIMS

C. MICHAEL HILL, United States Magistrate Judge.

Pending before the undersigned for Report and Recommendation is the Motion for Preliminary Injunction filed by plaintiff, Innovative Manpower Solutions, L.L.C. ("Innovative"), on July 17, 2012. [rec. doc. 7]. Defendants, Thaddeus Pete Marcell, Jr. ("Marcell") and Ironman Staffing, L.L.C. ("Ironman"), filed opposition on September 26, 2012. [rec. doc. 40]. A hearing was held on October 1–3, 2012, after which the undersigned allowed post-hearing briefs. [rec. doc. 51].

On October 23, 2012, Ironman filed its Post–Trial Brief. [rec. doc. 66]. Innovative also filed its Post–Trial Brief on October 23, 2012. [rec. doc. 68]. Reply briefs were filed by Innovative on October 30, 2012 [rec. doc. 70], and Ironman on October 31, 2012 [rec. doc. 72], after which the undersigned took the matter under advisement. For the following reasons, I recommend that the motion be **DENIED.**

Also pending before this Court is the Motion to Dismiss Supplemental State Law Claims filed by Ironman on August 8, 2012. [rec. doc. 17]. Innovative filed opposition. [rec. doc. 16]. Defendants filed a Reply on August 31, 2012. [rec. doc. 26]. After a hearing on September 4, 2012, the undersigned deferred the ruling until after the hearing on the Preliminary Injunction. [rec. doc. 28]. For the following reasons, I recommend that the motion to dismiss be **GRANTED.**

### FACTUAL BACKGROUND

The following constitute my findings of fact, based on the exhibits admitted at the hearing, the testimony of the witnesses and my determination of the credibility of the witnesses based on their demeanor and the other evidence in the record.

Innovative Manpower Solutions, L.L.C. ("Innovative") was formed in Louisiana on October 24, 2008. Innovative is owned by Dii, L.L.C., a wholly-owned subsidiary of Dynamic Energy Services International ("Dynamic"). [Transcript, p. 7]. Dynamic

is owned by Michael Moreno ("Moreno"), Carlyle/Riverstone, and Mr. Rucks. [Tr. 104]. Innovative engages in the business of manpower services by providing skilled labor, such as welders, pipe fitters, and carpenters, to companies engaged in the domestic and international, onshore and offshore, oil and gas industry.

By letter dated December 23, 2008, Innovative offered to employ Marcell in the position of Manager. [Plaintiff's Exhibit 52; Tr. 19].[1] Moreno, along with Jeff Holmes ("Holmes"), hired Marcell for Innovative. [Tr. 609]. The December 23, 2008 letter contains general terms and conditions of Marcell's employment with Innovative. Marcell agreed to the terms of the offer of employment by signing the offer letter on December 23, 2008 (the "Employment Agreement").

The terms of the Employment Agreement provided that Marcell would be paid a base salary at the annual rate of $100,000.00. [Plaintiff's Exhibit 52]. The agreement also provided for "Other Compensation" as follows:

> You will be eligible for performance-related bonuses according to the Company bonus program as well as participation in the stock option program yet to be developed.

[*Id.*]. The contract also provided that Marcell would be eligible to be issued a company vehicle, gas card, cell phone, and laptop computer.

Innovative never developed a stock option plan. [Tr. 21, 104–07, 621]. No company bonus program was ever formalized, although Marcell did receive bonuses. Marcell was not provided with a company vehicle and a gas card during his employment. [*Id.*].

Also on December 23, 2008, Marcell executed a Statement of Understanding and Agreement (Reference: CMP 401: CONFIDENTIALITY) (the "Confidentiality Agreement"), which provided, in pertinent part, as follows:

1. I am responsible for maintaining the confidentiality of the information with which I work. This includes keeping information secure and accessible only to those who have rights to this information.

2. I am accountable for maintaining the highest standards possible for managing Company and individual information in a secure and professional manner.

3. I will not disclose confidential or proprietary information in any manner of communication (e.g., electronic, written and oral communication, or other means of disclosure) without authorization of senior management.

4. If at any time, data under my care and responsibility is thought to be compromised, I will immediately notify Human Resources, General Counsel, or other member of senior management. I understand that intentionally accessing user data and information or causing information to be compromised or improperly released through my negligence will be grounds for immediate dismissal.

5. During the course and scope of my employment with the Company, I understand that I may create works or generate original material. I further understand that all such works and material are the property of the Company and may not be disclosed

---

1. The letterhead contains the name Moreno Group, L.L.C., which was the predecessor company to Dynamic. [Tr. 20].

or removed from the Company or used for any non-Company-related purpose without authorization from senior management. [Plaintiff's Exhibit 52].

Emile Dumesnil ("Dumesnil"), President of Dynamic Industries, testified at the hearing that Marcell was required to keep all of Innovative's documents confidential, which included Innovative's Master Service Agreements ("MSA"), pricing lists with clients, identity and skills of its craft, and "basically all the information that would be very useful for a competitor if they were interested in competing with us." [Tr. 29]. He explained that the obligation of confidentiality was placed on employees to protect Innovative's franchise, meaning that "particularly when it comes to a contract labor company, your assets, as you say, go home every day. It's a business that were the information to fall into a competitor's hands, they would be able to duplicate our MSAs, duplicate our pricing, steal our craft [employees]." [Tr. 30].

Section 12 of the Employment Agreement contained the following provision regarding "Outside Activities" as follows:

While you render services to the Company [Innovative], you will not engage in any other gainful employment, business or activity without the written consent of the Company. While you render services to the Company, you also will not assist any person or organization in competing with the Company, in preparing to compete with the Company or in hiring any employees of the Company. [Plaintiff's Exhibit 52].

Dumesnil testified that under the Outside Activities provision, Marcell was under the obligation not to compete with Innovative, prepare to compete with Innovative, or hire Innovative's employees. [Tr. 22].

Additionally, Dynamic's Employee Handbook contained the following provision:

**4.2.5  Employee–Generated Information.**  The Company considers proprietary all information generated by employees during the course and scope of their employment. Such information includes but is not limited to financial data or statements, trade secrets, product research and development, marketing plans or techniques, trade and service marks and client lists.

[Plaintiff's Exhibit 356].

Dynamic also had an Ethics policy which provided, in pertinent part, as follows:

**1.2.1**  Each employee shall be committed to the responsible use of corporate assets, to communicate with each other accurately and honestly.

**1.2.2**  Each employee must respect and protect the confidentiality of financial and other non-public information, to act in good faith and exercise due care in all he/she does, to comply with all rules and regulations of our professions, and to proactively promote ethical behavior.

[Plaintiff's Exhibit 47].

Under the Employment Agreement, Marcell's start date with Innovative was January 1, 2009. [Plaintiff's Exhibit 52]. He was hired as the principal officer of Innovative. [Tr. 9]. His duties were to develop Innovative's contract labor pool, develop Innovative's client relationships and arrange a lease for the business. [*Id.* at pp. 9, 15]. Marcell was also charged with the day-to-day management of the craft labor of Innovative. [Tr. 111]. Additionally, he had the authority to hire, fire, recruit, and retain employees. [Tr. 177].

Marcell's direct supervisor was Holmes. [Tr. 110]. Holmes' supervisor was Bruce Bown ("Bown"), president of Dynamic's Specialty Construction Services Division. [Tr. 261]. Marcell's staff consisted of recruiters Juan F. Morales ("Morales") and Umburto Garcia ("Garcia"); receptionist Blanca Jesusa Cantu–Xona ("Cantu–Xona"), and administrative assistant Gabriela Millan ("Millan"). [Tr. 111, 158, 187–88].

Marcell had used Morales, Garcia, and Javier Valueta ("Valueta") as recruiters while he was at Southland Energy Services, where he was employed before leaving for Innovative. [Tr. 609]. These three individuals came with Marcell to work as recruiters when he moved to Innovative. When Morales, Garcia, and Valueta moved to Innovative, most of their contract labor pool followed them. The evidence was clear that the employees (the laborers) tended to follow the "recruiters" who had initially recruited them.

Since at least as early as October 24, 2008, Innovative used the first letters in its company name, IMS, as part of its logo. In 2009, Marcell and a friend who owned Southland Energy Services designed the logo for Innovative, which consisted of a globe circled by the name Innovative Manpower Solutions, LLC and the letters IMS in blue, backed with green at the bottom. [Tr. 112–14; Plaintiff's Exhibit 120].

In April, 2012, Moreno informed Marcell that he was not going to receive a bonus or pay raise. [Tr. 188, 194]. At that time, Marcell decided to leave Innovative. [Tr. 188–89]. A few days later, Marcell registered Ironman with the Louisiana Secretary of State. [Tr. 189]. The Louisiana Secretary of State's records show that Ironman was formed on April 30, 2012. [Plaintiff's Exhibits 414, 497]. Marcell is named as the Manager and Registered Agent of Ironman. The Articles of Organization of Ironman were adopted by Marcell on April 30, 2012. [Plaintiff's Exhibit 439].

On May 1, 2012, Marcell registered the domain name *"www.ironmanstaff.com"*. Tripp Hicks ("Hicks"), a personal friend of Marcell's who was the IT "person" for Conrad Shipyards, set up the domain name for Marcell. [Tr. 144].

While employed by Innovative, Marcell owned other companies and businesses including Marcell Properties, a storage and carwash facility, Amelia Superette, Inc., Tiger Gaming and Pete's Sports Bar [Plaintiff's Exhibit 314F; Tr. 210–11]. Marcell sold Tiger Gaming and Pete's Sports Bar in 2010 or 2011. [Tr. 211].

In May of 2012, Marcell and his brother, Jacob Marcell ("Jacob"), leased a building for Ironman's business. [Tr. 201–05]. Also in May, 2012, Marcell attempted to acquire worker's compensation insurance and funding for Ironman. [Tr. 206–07; Plaintiff's Exhibit 314F]. A worker's compensation insurance policy was issued for Ironman on June 25, 2012. [Plaintiff's Exhibit 475; Tr. 222].

Jacob also set up a bank account for Ironman in May, 2012, on which Marcell had signing authority. [Plaintiff's Exhibit 480; Tr. 207–08]. On June 11, 2012, Jacob deposited $15,000.00 into Ironman's bank account. [Plaintiff's Exhibit 480; Tr. 209]. On June 13, 2012, Marcell signed a check for $7,092.23 written to Gulfland Office Supplies for desks, filing cabinets, and small office supplies. [Plaintiff's Exhibit 480; Tr. 212]. Also in June, 2012, Marcell signed checks on Ironman's bank account for rent, a van, computers, glass, an occupational license, electricity, cable, and water deposit. [Plaintiff's Exhibit 480; Tr. 213–19].

By email dated June 14, 2012, Hicks confirmed that he was setting up an email account for Ironman. [Plaintiff's Exhibit

314F]. Marcell had instructed Hicks to create the account a couple of days prior to June 14. [Tr. 200]. Hicks indicated in the email that he was going to come by Innovative's offices to finish setting up the computer system and email accounts for Millan, Cantu, and Morales, who were still employed by Innovative, as well as B. Bergeron and Valueta. [Plaintiff's Exhibit 314F; Tr. 201–02].

As of June 29, 2012, Innovative's workforce had grown to approximately 135 skilled laborers and about four staff personnel. [Tr. 111]. The primary "arms length" customers of Innovative as of that time were Conrad Shipyards ("Conrad"), Bollinger, and A & B Industries ("A & B"). [Tr. 16]. Innovative also supplied labor to other divisions of Dynamic. Conrad, A & B, and Bollinger had been Marcell's customers at Southland, and had followed Marcell from Southland to Innovative. [Tr. 609; Defendants' Exhibit 79A, p. 55]. Approximately 110 of the craft laborers worked at Conrad, Bollinger and A & B. [Tr. 111–12].

On the afternoon of Friday, June 29, 2012, Marcell submitted his resignation by email to Holmes. [Tr. 241, 635]. In the email message from Marcell to Holmes, which was sent at 4:21 p.m. on June 29, Marcell wrote the following:

Dear. Mr. Holmes,

Please accept this correspondence as my official resignation as manager of Innovative Manpower Solutions, a division of Dynamic Industries, effective July 1, 2012. This decision was not made lightly; however, at this point in my life, this is what I need to do for my family. I appreciate all the opportunities afforded to me and the friendships made along the way.

Respectfully,

Thaddeus J. Marcell, Jr.
[Plaintiff's Exhibit 64].

Immediately following the email, Holmes contacted Marcell, who confirmed his resignation. [Tr. 635]. Dumesnil learned that Marcell was resigning from Innovative through the email forwarded by Bown. [Tr. 10, 44]. After Dumesnil received the message from Bown, the following e-mail exchange took place between Dumesnil and Marcell from 6:18 to 6:58 p.m.:

Dumesnil: Just found out your [sic] leaving. Very sorry to hear that. Where you heading?

Marcell: Emile, just decided to pursue other opportunities. . . .

Dumesnil: . . . What are the other opportunities? Obviously we need labor and would be happy to continue using you if you're staying in the business. Are you?

Marcell: Well, my wife and I are still talking about options, but we all know I enjoy the labor business. If I do go in the same direction, I would definitely appreciate a working relationship with you and Dynamic. I'll keep in touch.

Dumesnil: Let me know. If you stay in the business, we've got a heck of a fine labor company that churns out $1.2 million or so per year in Ebitda [earnings before interest, taxes, depreciation, and amortization] that I might sell you. J.

[Plaintiff's Exhibits 62, 63; Tr. 13].

Dumesnil testified that the revenue of Innovative on a trailing 12–month basis was approximately $12 million. [Tr. 14]. He further testified that Innovative's value as of the date of Marcell's resignation, June 29, 2012, was approximately $9.6 million, or eight times the cash flow of $1.2 million. [Tr. 45]. Marcell testified that Innovative's projected revenue for 2012 was about $12 million, and the net profit generated was about $1.2 to $1.3 million. [Tr. 129–31].

On June 26, 2012, at 2:00 p.m., Marcell sent an email to Jerome Eymard ("Eymard"), Bollinger's HR director, to set up a meeting. [Plaintiff's Exhibit 57; Tr. 229–30]. Marcell met with Eymard at Bollinger on June 27 to tell him that he was leaving Innovative. [Plaintiff's Exhibit 58; Tr. 230].

Marcell testified that no one at Innovative knew that he was leaving Innovative until he told his office staff on June 29, 2012, at around 4:45 p.m. [Tr. 247, 641]. That testimony was corroborated by the staff without contradiction.

On June 26, 2012, at 5:44 p.m., Marcell's assistant, Millan, sent an email from her computer at Innovative to Marcell at the email address *"tmarcell@irnomanstaff. com."* [Plaintiff's Exhibit 55]. Attached to the email was a rate sheet for Bollinger dated July 2, 2012, topped with the letters IMS in blue outlined in green, with Ironman Staffing LLC in a smaller font in green directly below. [Plaintiff's Exhibit 54, p. 2]. Millan created this letterhead at Marcell's instruction. [Tr. 161].

On June 26, 2012, at 5:48 p.m., Millan sent an email from a computer at Innovative to Marcell at the email address *"tmarcell@irnomanstaff.com."* [Plaintiff's Exhibit 54]. Attached to the email was a rate sheet for the Recreation District No. 4 of the Parish of St. Mary dated July 2, 2012, with the same logo as the document sent to Bollinger. [Plaintiff's Exhibit 54, p. 2]. Marcell testified that he hand-delivered this document to a representative of the Parish on July 2. [Tr. 158].

On June 26, 2012 at 5:49 p.m., Millan sent a second email to Marcell at the same email address regarding Bollinger with a rate sheet [Plaintiff's Exhibit 56]. Both of these documents regarding Bollinger also contained Marcell's phone number and fax at Ironman. [Tr. 171]. Marcell testified that he had planned to bring these documents to Bollinger on July 2 when he went to work for Ironman. [Tr. 171].

On June 29, 2012, Marcell sent an email to Darlene Perkins at the Bourgeois Medical Clinic at 3:45 p.m. to have an account set up for Ironman's employees. [Plaintiff's Exhibit 59; Tr. 232, 239–40]. In the email, Marcell instructed her to start using the Ironman email address. [Plaintiff's Exhibit 59; Tr. 232].

On the afternoon of June 29, 2012, Marcell called Millan and Cantu into his office and showed them his resignation letter.[2] [Tr. 241]. They both asked Marcell if they could come with him. Afterwards, Marcell told Cantu that he was leaving to go work for his brother, and she asked to go with him also. [Tr. 241–42]. Marcell left Innovative's office at about 5:15 p.m. on June 29. [Tr. 242].

Morales confirmed that on June 29, 2012, Marcell told him that he had resigned. [Plaintiff's Exhibit 505A, pp. 21–22, 60]. At that point, Morales asked Marcell what was going to happen to him (Morales). [*Id.* at p. 61; Tr. 566]. Marcell told Morales that Morales could come work for Marcell. [*Id.* at p. 62].

At the end of the business day on June 29, Garcia discovered that Marcell was

**2.** Millan had performed acts at Marcell's direction before the 29th which are indicative of Marcell's preparation to leave and compete against Innovative as set out above. Millan testified that she did not understand the actions which Marcell ordered her to perform meant that Marcell was planning on leaving. She testified that she never thought about it at all, and simply did what her boss ordered.

Millan's testimony in this regard is not central to the resolution of the issues before the Court. However, while Millan's testimony is facially suspect, based on the Court's careful observation of Millan's demeanor on the witness stand, the Court accepts as true Millan's testimony that she never thought about the import of her actions and simply did as her boss ordered.

leaving innovative. [Defendant's Exhibit 78]. When Garcia learned that Marcell was leaving, Garcia also decided to quit working for Innovative. [Defendant's Exhibit 78].

On the evening of June 29, Morales told one of the contract laborers, Angel Rivera–Serrano, that he was leaving Innovative. [Plaintiff's Exhibit 505A, p. 87–89].

Also on the evening of June 29, Marcell called Valueta that told him that he was resigning from Innovative. [Tr. 548]. Marcell offered him a job that same night. [Tr. 549].

On Saturday, June 30, Marcell offered Morales a job. [Id. at pp. 62–63; Tr. 566–67]. That same day, Marcell went into his office at Innovative to gather his personal belongings. [Tr. 242]. He had asked Garcia to remove some personal files from his computer. [Tr. 243]. Marcell said that he did not download any business files from his computer on June 29 or 30. [Tr. 242–43].

On June 30, Marcell had lunch with Shane Alfred ("Alfred"), Conrad's HR director, whom he had known since high school. [Tr. 628]. Marcell told Alfred that he was leaving Innovative and going to work for his brother at Ironman. [Tr. 246; Defendant's Exhibit 76]. Marcell asked Alfred whether or not it would be agreeable to Alfred to allow the workers who wished to follow Marcell to continue working at Conrad; Alfred agreed. [Defendant's Exhibit 76].

On Saturday, June 30, Marcell told Garcia to call the workers and inform them that Marcell, Millan, Morales, and Valueta were going to work for Ironman. [Tr. 244]. Marcell also instructed Garcia, Morales, and Valueta to see whether or not the contract workers would transfer over to Ironman.

That day, Morales called Garcia, and told Garcia that he was going to take a job with Marcell. [Plaintiff's Exhibit 505A, at pp. 65–66, 67–68]. Also on June 30, Morales and Garcia contacted about 60 Innovative workers, including Angel Rivera–Serrano, to offer them jobs with Ironman. [Id. at pp. 73–74, 76–82, 86–88, 247–48]. Morales used the contact names and numbers of the contract workers which he had on his cell phone. [Tr. 567]. Garcia also maintained the personal contact information for the contract workers on his cell phone. [Defendant's Exhibit 78]. After receiving a call from Garcia on June 30, Valueta contacted the contract laborers. [Tr. 549]. Nearly every one of the contract workers decided to change their employment to Ironman. [Defendant's Exhibit 78].

On Sunday, July 1, Garcia prepared termination notices for slightly more than 100 Innovative workers. [Tr. 249–50, Defendant's Exhibit 78]. These contract laborers, who were working at Bollinger, Conrad, and A & B, started signing conditional job offers at Ironman's place of business on July 2, 2012. [Plaintiff's Exhibit 505A, at pp. 82–85, 249].

On July 1, 2012, Marcell talked with A & B's manager John Arceneaux ("Arceneaux"), who was his next-door neighbor, and told him that he had resigned from Innovative. [Tr. 246; Defendant's Exhibit 77]. Marcell asked Arceneaux if he would have a problem with the workers who were at A & B switching to Ironman; Arceneaux responded that he would not.

On July 2, 2012, Morales went into Innovative's office and told "Brian" [Bergeron] that he was going to quit and go work for Marcell. [Plaintiff's Exhibit 505A, at pp. 36–37]. Brian told Morales to take vacation for a week, which he did. [Id. at pp. 28–32, 39, 69]. On July 9, 2012, Morales started working with Ironman. [Id. at pp. 27, 31–32].

On June 29, 2012, Marcell offered Cantu–Xona a job with his new company.

[Plaintiff's Exhibit 506A, at pp. 31–32]. She provided notice of her resignation from Innovative on July 2, 2012. [*Id.* at pp. 103–04]. Her last day at Innovative was July 6, 2012. [*Id.* at pp. 23, 60]. Cantu–Xona started working at Ironman on July 9, 2012. [*Id.* at p. 35].

On the morning of July 2, 2012, one of Innovative's employees found an envelope containing approximately 129 resignations from the contract laborers. [Plaintiff's Exhibits 69A, 69B; Tr. 72, 250]. These notices contained Garcia's signature and were dated July 1, 2012. [Plaintiff's Exhibits 69A, 69B].

Also during the morning of July 2, 2012, Marcell met with Larry Clement, president of Dynamic, and Holmes, vice president of Dynamic, and informed them that he was leaving Innovative. [Tr. 639; Defendants' Exhibit 79A, p. 47]. He also told them that he had terminated the contract workers in accordance with Innovative's procedures, then rehired them. [Defendants' Exhibit 79A, p. 47]. By e-mail from Holmes to Doug Blair dated July 2, 2012, at 9:54 a.m., Holmes confirmed that he would prepare a termination notice on Marcell effective June 30. [Defendant's Exhibit 48].

Dumesnil testified that besides the "arms length" clients (Conrad, Bollinger and A & B), Innovative provided about 20 to 30 people to a sister company of Dynamic. [Tr. 50]. He stated that over 100 of Innovative's employees left with Marcell. [Tr. 48]. These former Innovative employees went to work for Ironman on July 2, 2012. [Tr. 188].

On July 2, 2012, Ironman executed a Master Service Agreement ("MSA") with Conrad. [Defendant's Exhibit 3; Tr. 224, 247, 656]. A & B also signed an MSA with Ironman on July 2, 2012. [Defendant's Exhibits 5, 77; Tr. 661]. Ironman received a proposed MSA from Bollinger on July 2, which Marcell signed on July 2 and received back from Bollinger on July 5. [Tr. 662; Defendant's Exhibit 4].

When Marcell first started Ironman, his business cards contained the letters "IMS." A few weeks later, Ironman got new business cards without the letters "IMS." Morales confirmed that his first business card at Ironman contained the letters "IMS." [Exhibit 505A, pp. 100–01]. He said that he received new business cards in August, 2012, which no longer contained the letters "IMS." [*Id.* at pp. 101–03].

When Ironman started to operate, the sign outside its business contained the letters "IMS." Morales confirmed that the sign originally contained the letters "IMS", but the sign was now gone. [Plaintiff's Exhibit 505A, pp. 103–04].

On July 9, 2012, Innovative filed a Complaint for Damages, Penalties and Injunctive Relief against Marcell and Ironman for false designation of origin and unfair competition, injury to business and dilution, breach of fiduciary duty, breach of employment agreement, breach of confidentiality agreement, unfair and deceptive trade practices, and misappropriation of trade secrets. Jurisdiction was asserted to 28 U.S.C. §§ 1331, 1337, 1338(a) and (b), and 15 U.S.C. § 1121 as arising in part under the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.*, and under 28 U.S.C. § 1367 for the Louisiana state law claims. On July 17, 2012, Innovative filed the instant Motion for Preliminary Injunction. [rec. doc. 7].

## *LEGAL ANALYSIS*

### *Standard for Preliminary Injunction*

■ The grant or denial of a preliminary injunction rests in the discretion of the district court, subject only to the satisfaction of four prerequisites enumerated by the Fifth Circuit for granting such relief. *Johnson Controls, Inc. v. Guidry,* 724 F.Supp.2d 612, 619 (W.D.La.2010) (*cit-*

ing Enterprise Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana, 762 F.2d 464, 472 (5th Cir.1985)). In order to obtain a preliminary injunction, the plaintiff must demonstrate each of the following prerequisites: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the opponent; and (4) that granting the preliminary injunction will not disserve the public interest. *Apple Barrel Productions, Inc. v. Beard,* 730 F.2d 384, 386 (5th Cir.1984).

■ A preliminary injunction is an extraordinary and drastic remedy. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir.1985). It should only be granted if the movant has clearly carried the heavy burden of persuasion on all four prerequisites. *Id.; Vision Center v. Opticks, Inc.,* 596 F.2d 111, 114 (5th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980); *Enterprise International v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir.1985). The decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Id.* (citing *State of Texas v. Seatrain International, S.A.,* 518 F.2d 175, 179 (5th Cir.1975); *Canal Authority State of Fla. v. Callaway,* 489 F.2d 567, 576 (5th Cir.1974)).

### 1. Likelihood of Success on the Merits

### Claim's for Breach of Fiduciary Duty and Breach of Employment Contract

Innovative asserts that it is likely to succeed on the merits of its claims for breach of fiduciary duty and breach of employment contract. [rec. doc. 68, p. 9].

■ As a general proposition, for a fiduciary duty to exist, there must be a fiduciary relationship between the parties.[3] *Scheffler v. Adams and Reese, LLP,* 2006–1774 (La.2/22/07); 950 So.2d 641, 647. An employee owes his employer a duty to be loyal and faithful to the employer's interest and business. *ODECO Oil & Gas Co. v. Nunez,* 532 So.2d 453, 463 (La.App. 1st Cir.1988) (citing *Dufau v. Creole Engineering, Inc.,* 465 So.2d 752 (La.App. 5th Cir.), *writ denied,* 468 So.2d 1207 (La. 1985)). He is duty-bound not to act in antagonism or opposition to the interest of the employer. *Neal v. Daniels,* 217 La. 679, 682, 47 So.2d 44 (La.1950). However, this duty of allegiance does not rise to the level of a fiduciary duty unless the employee is also an agent or mandatary of his employer. La. Prac. Employment Law § 14:14 (2011–2012 ed.).

■ As an example of Marcell's alleged duty, Innovative cites the following principle: "[m]embers of a member-managed LLC and managers of a manager-managed LLC, like corporate directors, have fiduciary duties to the LLC and its members." [rec. doc. 68, p. 9 (citing 9 La. Civ. L. Treatise § 1.25 (3d ed.))]. This refers to the duty imposed under LA. REV. STAT. § 1314, which provides that a manager or managing member owes a fiduciary duty to the LLC and its members as follows:

A. Subject to R.S. 12:1315, a member, if management is reserved to the members, or manager, if management is vested in one or more managers pursuant to R.S. 12:1312:[4]

---

3. The parties agree that Louisiana law applies to this dispute.

4. LA. REV. STAT. 12:1312 provides that "[t]he articles of organization may provide that the business of the limited liability com-

(1) Shall be deemed to stand in a fiduciary relationship to the limited liability company and its members and shall discharge his duties in good faith, with the diligence, care, judgment, and skill which an ordinary prudent person in a like position would exercise under similar circumstances. Nothing contained in this Section shall derogate from any indemnification authorized by R.S. 12:1315.[5]

Innovative argues that Marcell was "not just an ordinary employee." However, Dumesnil, who is Dynamic's president and CEO, testified that Marcell was an "employee" who was hired to head-up Innovative. [Tr. 9]. He stated that Marcell's duty was to develop Innovative's contract labor pool and develop client relationships. *Id.* Although Dumesnil referred to Marcell as Innovative's "principal officer," Innovative did not identify Marcell as an officer or director in its response to defendants' interrogatories. [Defendant's Exhibit 41, p. 11]. Nothing in the Employment Agreement indicates that Marcell was anything other than a salaried employee. [Plaintiff's Exhibit P52]. No evidence exists that Marcell was provided with management authority pursuant to R.S. 12:1312.

In short, I find that Marcell owed a duty to Innovative as an employee, but did not owe a fiduciary duty to Innovative.

Accordingly, the undersigned finds that Innovative has not met its burden of showing a likelihood of prevailing on the merits of its claims for breach of fiduciary duty.

### Breach of Employment Contract

### Louisiana Unfair Trade Practices Act

Innovative argues that Ironman violated the Louisiana Unfair Trade Practices and Consumer Protection Law, LA. REV. STAT. § 51:1401, *et seq.,* by: (1) setting up a brand new competing company and then commencing operations in the identical market as that of Innovative, (2) using Innovative's employees to assist in setting up a new company, (3) terminating most of Innovative's employees effective July 1, 2012 only to turn around and rehire them as Ironman's employees on July 2, 2012, (4) conducting negotiations with all of Innovative's arms length customers amounting to about $9 million of annual revenue, (5) interfering with and impairing Innovative's service agreement with 100% of Innovative's arms length customers, (6) entering into competing service agreements with those customers, and (7) using a mark virtually identical to IMS's mark, all to the detriment and injury of IMS. [rec. doc. 68, p. 23].

The Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), LA. REV. STAT. 51:1401, *et seq.,* provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." LA. REV. STAT. § 51:1405. LUTPA provides a cause of action both for trade practices which are "unfair" and those which are "deceptive." *Jefferson v. Chevron U.S.A., Inc.,* 97–2436, 98–0254 (La. App. 4 Cir. 5/20/98); 713 So.2d 785, 792. To recover under LUTPA, a plaintiff must "prove some element of fraud, misrepresentation, deception or other unethical conduct." *Tubos de Acero de Mexico, S.A. v. American Intern. Inv. Corp., Inc.,* 292 F.3d 471, 480 (5th Cir.2002) (*quoting Omnitech Intern., Inc. v. Clorox Co.,* 11 F.3d 1316, 1332 (5th Cir.1994)). "A trade practice is unfair under the statute only when

---

pany shall be managed by or under the authority of one or more managers who may, but need not, be members."

**5.** LA. REV. STAT. 12:1315 provides for limitation of liability and indemnification of members and managers.

it offends established public policy and is immoral, unethical, oppressive or unscrupulous." *Id.* (*quoting Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.,* 220 F.3d 396, 404 (5th Cir.2000)). What constitutes an unfair trade practice is determined by the courts on a case-by-case basis. *Id.*

■ Innovative argues that Marcell violated LUTPA by soliciting Innovative's customers while he was still employed. [rec. doc. 70, p. 20]. The solicitation and diversion of an employer's customers *prior* to termination constitutes unfair competition entitling the plaintiff to recover damages. *Dufau,* 465 So.2d at 758 (emphasis in original). Solicitation of customers after the end of the employment relationship does not form the basis of a cause of action for unfair competition. *First Page Operating Under the Name and Corporate Entity, Groome Enterprises, Inc. v. Network Paging, Corp.,* 628 So.2d 130, 137 (La.App. 4th Cir.1993).

Here, the testimony establishes that Marcell did not solicit Innovative's customers until *after* he had resigned from the company. [Tr. 158, 171, 230, 224, 246, 247, 628, 661, 662]. (emphasis added). This is confirmed in part by the affidavits of Alfred of Conrad and Arceneaux of A & B that state that Marcell did not solicit their business until after Marcell's resignation on June 29. [Defendant's Exhibits 76, 77]. Further, the MSAs with Conrad, Bollinger and A & B were not executed until July 2 or later. [Defendant's Exhibits 3, 4, 5]. Thus, defendants' actions do not constitute a violation of LUTPA.

Innovative asserts that this case is analogous to *National Oil Service of La., Inc. v. Brown,* 381 So.2d 1269 (La.App. 4th Cir.1980). In *Brown,* the court granted relief to enjoin three former employees from conducting an identical waste oil business in plaintiff's business area where, among other things, defendants fired plaintiff's most experienced driver and pirated two other drivers; copied and took plaintiff's customer lists, route system records and many customer contracts; removed equipment and records; stole collected oil, and told many customers that plaintiff was out of business or had changed its name.

Innovative argues that Marcell's activities were "even more egregious" than the facts in *Brown.* However, *Brown* involved criminal acts which are not present here. The undersigned simply does not find *Brown* to be applicable on the facts.

■ Here, the record reflects that Marcell hired Innovative's former employees and entered into negotiations with Innovative's former customers *after* his resignation. Additionally, the evidence shows that Innovative's employees willingly left with Marcell, and that the contract laborers followed Innovative's former recruiters as they had done when Marcell and the same recruiters left Southland for Innovative. Under these circumstances, the Court does not find that defendants' actions constituted unfair trade practices.

### *Louisiana Uniform Trade Secrets Act*

Innovative alleges that Marcell violated the Louisiana Uniform Trade Secrets Act ("LUTSA"), LA. REV. STAT. 51:1431, *et seq.,* by misappropriating its trade secrets, including MSAs, pricing lists with clients, the identify of the craft, the skills of the craft, and "basically all information that would be very useful for a competitor if they were interested in competing with" Innovative. [rec. doc. 68, p. 28].

■ Broadly, LUTSA proscribes the misappropriation of information that constitutes "trade secrets." *Johnson,* 724 F.Supp.2d at 628 (*citing* LA. REV. STAT. § 51:1431). A plaintiff may obtain injunctive relief for either "[a]ctual or threatened

misappropriation." *Id.* (quoting La. R.S. 51:1432). However, an injunction may be issued "only upon a showing of irreparable loss or injury without an adequate remedy at law." *Id.* (quoting *Tubular Threading, Inc. v. Scandaliato,* 443 So.2d 712, 715 (La.App. 5th Cir.1983)). The applicant "must also show that the threat is immediate and that there is a clear and present need for it." *Id.* In cases involving trade secrets, R.S. 51:1432 directs the court to issue injunctions but only *actual or threatened misappropriations* may be enjoined. (emphasis in original). *Scandaliato,* 443 So.2d at 715.

■ "In order to show that the trade secrets have been misappropriated, [the employer] would have to prove that (1) a trade secret existed, and (2) that they were misappropriated by the [employee]." *Johnson,* 724 F.Supp.2d at 628–29 (*quoting Ferrellgas, L.P. v. McConathy,* 2010 WL 1010831, at *7 [internal citation omitted]). The term "misappropriation" is defined as "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *Id.* (*citing* LA. REV. STAT. § 51:1431(2)).

■ The LUTSA provides a specific definition of the term "trade secret": " 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that . . . derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and . . . is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." LA. REV. STAT.

§ 51:1431(4). Determining whether information qualifies as trade secrets is a question of fact. *Id.* (*citing Ferrellgas* at *7).

Innovative argues that it has shown the existence of trade secrets, including documentation regarding MSAs, pricing lists with clients, identity of the craft, skills of the craft, and "basically all information that would be very useful for a competitor if they were interested in competing with [Innovative]." [rec. doc. 68, p. 28]. "The threshold inquiry in every trade secrecy case is whether a legally protectable trade secret exists in fact." *Id.* (*quoting Core v. Martin,* 543 So.2d 619, 621 (La.App. 2nd Cir.1989)). Louisiana courts have held that "[a] customer list or special pricing list may be a trade secret if efforts are made to maintain its secrecy." *Id.* (*citing Ferrellgas,* 2010 WL 1010831 at *8 [*quoting Pontchartrain Med. Labs. Inc. v. Roche Biomedical Labs., Inc.,* 677 So.2d 1086, 1090 (La.App. 1st Cir.1996)]).

Here, Innovative had three "arms length" customers—Conrad, Bollinger, and A & B—during the time of Marcell's employment. Marcell had long-standing personal and business relationships with these three customers, which predated his employment by Innovative. One of these contacts was Marcell's next-door neighbor, another he had known since high school, and the third he had known for over 20 years. [Tr. 246, 628; Defendants' Exhibits 76, 77]. Marcell's memory as to the value and operations of these three customers does not constitute "trade secrets." [Defendants' Exhibit 79A, p. 71–72]; *Johnson,* 724 F.Supp.2d at 630; *Ferrellgas* at *8 (*citing Millet v. Crump,* 96–639 (La.App. 5 Cir. 12/30/96; 687 So.2d 132, 136) (holding that information that an insurance agent "could recall . . . about renewals on some of her former clients because of the long-term relationship with them through her

business as well as socially" did not constitute trade secrets)); *see also Weighing & Control Servs., Inc. v. Bert Williams,* 1989 WL 6011 (E.D.La. Jan. 24, 1989) ("a former employee is allowed to rely on his memory and on the general information he acquired while working for his former employer in soliciting customers ... mental knowledge, from years of employment ... of the names and addresses of the plaintiff's customers are not trade secrets....").

Additionally, the undersigned does not find that the remainder of Innovative's purported trade secrets, that is, MSAs, pricing lists, and identity of contract laborers, were entitled to protection. The record reflects that the file cabinets containing personnel information were kept unlocked. [Tr. 526–27]. MSAs are common contracts in the industry, the terms of which are often broadly known. Here, Bollinger actually furnished the MSA to Ironman for signing.

Additionally, the testimony establishes that the recruiters, Morales and Garcia, had the contact information for the contract workers on their cell phones. [Tr. 567; Defendant's Exhibit 78]. There is neither evidence that access to this information was restricted, nor that Innovative apprised its employees of the need for the secrecy of this information.

The undersigned finds that the case cited by Ironman, *Nursing Enterprises, Inc. v. Marr,* 30,776 (La.App. 2 Cir. 8/19/98); 719 So.2d 524, 528, is analogous. There, a nurse staffing company sought injunctive relief for alleged unfair trade practices against its former regional director who had opened a competing nurse staffing company. While employed with plaintiff, defendant's job was to develop business relationships with clients, recruit staff nurses and match these nurses with clients to fulfill the client's staffing needs. During her employment, defendant executed a covenant not to compete with plaintiff for a period of one year after termination of employment within a 70–mile radius of the Shreveport office, and confidentiality agreements.

After a dispute regarding a possible promotion, defendant resigned from plaintiff's company. Within the month prior to her resignation, defendant leased office space for a new nurse staffing company, installed a telephone in the new office, and consulted with an attorney about incorporation of her new company. Shortly after her resignation, she hired plaintiff's former clinical director, executed articles of incorporation, and began staffing nurses for clients, including one of plaintiff's former client hospitals.

Plaintiff filed suit against defendant, her physician husband, its former clinical director and the new company requesting injunctive relief, arguing that defendant had violated the covenants not to compete and the confidentiality agreements. The unfair trade practices claim was based on allegations that defendant violated her fiduciary duty to plaintiff by using or misappropriating information which constituted trade secrets in her efforts to form and operate a competing business entity. Plaintiff alleged that these trade secrets included client lists, employee lists, client business agreements, rate sheets, financial statements and other financial information. In holding that defendant did not violate UTPA or breach any fiduciary duty owed to her former employer, the court stated as follows:

> The evidence shows that [defendant] did not violate her fiduciary duty to [plaintiff] by using its trade secrets in the formation and operation of [the new company]. In fact, the information [plaintiff] alleges [defendant] misappropriated does not qualify as trade secrets. As for nurse lists, the evidence shows

that [plaintiff] and [plaintiff's former clinical director] had a personal relationship with many of these nurses and one could expect the nurses to follow [defendant] if they were being treated well by her and the company with which she was associated. In addition, these nurses were not exclusive to one agency. The testimony showed that nurses usually signed on with more that one agency to ensure they had consistent work. Finally, [defendant] testified that she was a member of an organization through which she could receive a list of all nurses in the state of Louisiana.

[Plaintiff] claims that [defendant] used either client lists or the relationships established with clients during her employment with [plaintiff] to lure those clients, especially [the client hospital], to do business with [the new company]. As stated by [defendant], the names and numbers of the hospitals and other medical providers is easily accessible through the local telephone book. [Defendant] also stated that when she began [the new company], she went to [the client hospital], which is where she first worked when she came to Shreveport. She also contacted [another hospital] where [plaintiff's former clinical director] worked prior to her employment with [plaintiff]. Finally, the fact that [defendant] solicited [plaintiff's] clients is not an unfair trade practice, and there is no evidence that [defendant] solicited these clients prior to terminating her employment with [plaintiff].

[Plaintiff] also claims that [defendant] misappropriated information related to nurses' salaries and client charges. Again, even if proven to be true, this information does not constitute trade secrets. The testimony shows that nurses routinely volunteered how much they were being paid by an agency. [Defendant] testified that she and other agency directors exchanged information and that the hospitals would release information relating to other agencies' charges in an effort to get a better contract price from her.

*Id.* at 529.

*Nursing* was cited with approval in a "closely analogous case", *Ferrellgas, L.P. v. McConathy,* 2010 WL 1010831 (W.D.La. March 15, 2010) (Drell, J). There, Judge Drell denied injunctive relief to a propane retail and services company claiming that its former operations manager violated a non-competition/solicitation clause in an employment contract by soliciting its customers and using its trade secrets. Plaintiff argued that its customer information should be characterized as "trade secrets," as such information was compiled and kept secret at great effort and expense to the company. The types of information which plaintiff alleged to be trade secrets were the expertise that defendant acquired as manager of its service center, such as knowledge of contract terms, pricing arrangements, and margins pertaining to its customers, and the identities of and relationships with plaintiff's customers. After defendant was terminated, he went to work for a competing propane retailer. Plaintiff filed suit for breach of contract and violation of LUTSA, alleging that defendant improperly used confidential and other trade secrets to solicit its customers.

In addition to finding that the non-competition agreement was invalid under Louisiana law (because it did not specifically designate the parishes to which it applied), the Court held that its former manager did not violate LUTSA. Initially, the Court found that defendant's memory as to the reliability, value, and operations of certain customers did not constitute trade secrets. Moreover, the Court found, the expertise and knowledge acquired by defendant was not protected, citing the established Louisiana principle that "[a] former employee

who enters business in competition with his former employer necessarily utilizes the experience he acquired and the skills he developed while in a former employment." *Id.* at *8 (*quoting Boncosky Servs., Inc. v. Lampo,* 98–2239 (La.App. 1 Cir. Nov. 5, 1999); 751 So.2d 278, 287 and *Ashland Chemical, Inc. v. Lombardino,* 1993 WL 390147, at *4 (E.D.La. Sept. 23, 1993)).

Additionally, Judge Drell found that the secrecy of the customer information was in doubt, noting that customers in the gas purchasing market often disclose contract terms and pricing arrangements amongst themselves and to competing providers in order to obtain more favorable terms. Further, the court held defendant's awareness of customer identities, along with some customer information, were not protected, as they "fell within the general category of knowledge, savvy, and skills which a former employee is entitled to utilize in competition with a former employer." *Id.* (*citing Boncosky Servs., Inc. v. Lampo,* 98–2239 (La.App. 1 Cir. 11/5/99); 751 So.2d 278, 287).

■ Applying the reasoning in *Nursing* and *Ferrellgas,* the undersigned finds that the information which Marcell allegedly misappropriated does not qualify as trade secrets. As for the list of contract laborers, the record reflects that Morales and Valueta shared information regarding contract employees with other recruiters. [Tr. 188]. Additionally, the evidence shows that these employees generally followed their recruiters. [Tr. 609]. Further, the record reflects that Innovative's three arms length customers, Conrad, Bollinger, and A & B, also knew the names of the contract employees who were working on their premises. [Tr. 565, 566].

In addition, the testimony establishes that Marcell had a long-standing personal relationship with the three clients at issue (which predated his employment at Inno-

vative), and that their contact information was clearly known to Marcell. Additionally, MSAs are regularly used by customers when dealing with vendors and are not considered as confidential. [Defendants' Exhibits 3, 4, 5; Defendants' Exhibit 79A, p. 67]. Moreover, I do not find that the laborer's rate information, which the laborers discussed with others in the industry, constitutes trade secrets. [Tr. 547, 548, 564; Defendants' Exhibit 79A, p. 85].

For the foregoing reasons, I do not find that Innovative is likely to succeed on the merits of its LUTSA claim.

*Non–Competition Agreement*

Innovative argues that Marcell breached his agreement not to compete or not to prepare to compete. [rec. doc. 68, pp. 14–15].

Louisiana has long had a strong public policy disfavoring noncompetition agreements between employers and employees. *SWAT 24 Shreveport Bossier, Inc. v. Bond,* 2000–1695 (La.6/29/01); 808 So.2d 294, 298 (*citing Louisiana Smoked Products, Inc. v. Savoie's Sausage & Food Products,* 96–1716, p. 11 (La.7/1/97), 696 So.2d 1373, 1379). Prior to the enactment of the first statutory authority for noncompetition agreements in 1934, Louisiana courts consistently held these agreements to be unenforceable. *Id.* at 303 (*citing Orkin Exterminating Co. v. Foti,* 302 So.2d 593, 596 (La.1974)).

By Act No. 133 of 1934, the Legislature enacted the state's first statute governing noncompetition agreements, explicitly providing that the public policy of the state to be "that employers shall not require or direct their employees ... to enter into any contract ... whereby and whereunder the employee agrees and contracts not to engage in any competing business for themselves or as the employee of another upon the termination of their contract with such employer," and declaring any con-

tract containing such provisions to be null and void as to those provisions.

Thus, the longstanding public policy of Louisiana has been to prohibit or severely restrict such agreements. *Id.* at 298. This public policy is currently expressed in La. R.S. 23:921(A)(1), which provides:

> Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.

■ Louisiana's strong public policy restricting these types of agreements is based on an underlying stated desire to prevent an individual from contractually depriving himself of the ability to support himself and consequently becoming a public burden. *Id.* (*citing McAlpine v. McAlpine*, 94–1595, p. 11 (La.9/5/96), 679 So.2d 85, 91). Because such covenants are in derogation of the common right, they must be strictly construed against the party seeking their enforcement. *Id.* (*citing Hirsh v. Miller*, 249 La. 489, 187 So.2d 709, 714 (1966)).

The exceptions to this public policy are specifically enumerated by the statute and provide for employer/employee relationships, among other things. *Id.* The statute defines the limited circumstances under which a noncompetition clause may be valid in the context of each of these relationships. The exception at issue in the instant case is provided for by Subsection (C), which reads:

> Any person, including a corporation and the individual shareholders of such corporation, who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment. . . .

La. R.S. 23:921(C).

Louisiana state courts, noting Louisiana's strong public policy against covenants in derogation of the common right to work, require strict compliance with the geographic and other limitations of LA. REV. STAT. § 23:921. *Lobrano v. C.H. Robinson Worldwide, Inc.*, 2011 WL 52602, *3 (W.D.La. Jan. 7, 2011) (Foote, J.). A majority of Louisiana state courts interpret § 23:921 to require that an employment contract specifically list the parishes or municipalities affected by the non-compete or non-solicit agreement. The Fifth Circuit has likewise recognized that under Louisiana law a "contract seeking to fit into an exception to this rule must strictly comply with the requirements contained in the statute." *Team Environmental Servs., Inc. v. Addison*, 2 F.3d 124, 126–27 (5th Cir.1993) (*quoting Comet Indus., Inc. v. Lawrence*, 600 So.2d 85, 88 (La.App. 2 Cir.1992)). The Western District has recognized this rule. *See, e.g., Johnson*, 724 F.Supp.2d at 620–21; *Ferrellgas*, at *3 ("[A] non-competition provision must be strictly limited to designated parishes and contain a maximum term of two years.").

■ Here, the non-competition provision neither contains a limitation to certain parishes or municipalities, nor does it contain a maximum time period. Thus, it is not legally enforceable under Louisiana law.

Innovative argues that the provision prohibiting Marcell from "assist[ing] any person or organization in competing with the Company, in preparing to compete with the Company or in hiring any employees of the Company" [Plaintiff's Exhibit 52], does not violate Louisiana's limitation

on non-competition agreements. [rec. doc. 68, p. 20]. Specifically, Innovative argues that it is the post-termination non-competition agreement that is subject to the limitations set forth in § 23:921. Absent a court order to the contrary, Innovative argues, Marcell will continue to compete against Innovative as this matter proceeds toward a future trial date.

■ *Even before termination,* the employee can seek other work or *prepare to compete,* except that he may not use confidential information acquired by him from his previous employer. (emphasis added). *SDT Industries, Inc. v. Leeper,* 34,655 (La. App. 2 Cir. 6/22/01); 793 So.2d 327, 333 (citing *United Group of Nat. Paper Distributors, Inc. v. Vinson,* 27,739 (La.App. 2 Cir. 1/25/96); 666 So.2d 1338, 1348). An employee's involvement in forming a competitive entity, including the solicitation of business and the hiring of employees, prior to terminating his current employment relationship, in and of itself, is not an unfair trade practice. *Id.; United Group, supra.*

Here, Marcell's actions in forming Ironman are not prohibited under Louisiana law. Although Innovative argues that its customer and contract worker lists were confidential, the record reflects that Marcell had long-standing relationships, both professionally and personally, with the three customers at issue prior to his leaving Innovative. Additionally, Innovative made no effort to keep its contract employee lists confidential. Further, evidence does not exist at this point that Marcell used confidential information to form his new company.

Competition and free enterprise are favored. *United Group,* 666 So.2d at 1348. The Louisiana Supreme Court has noted "Louisiana has long had a strong public policy disfavoring" non-compete and non-solicit restrictive covenants like those in the Employment Agreement at issue. *SWAT 24,* 808 So.2d at 298. The purpose of Louisiana's strong public policy "is based upon an underlying state desire to prevent an individual from contractually depriving himself of the ability to support himself and consequently becoming a public burden." *Id.* As long as conduct is neither unlawful nor offensive to public policy, persons are able to discuss changes of employment, effectuate a change of employment, plan to compete and take preliminary steps in furtherance of that plan. *Nursing,* 719 So.2d at 528; *United Group,* 666 So.2d at 1348.

■ In this case, the undersigned does not find that Marcell's actions were unlawful or offensive to public policy. The record reflects that Marcell used the contacts and skills that he had acquired through working with Innovative, as well as the knowledge he had acquired through his experience in the staffing business, to form his new company, Ironman. Under these circumstances, I find that Innovative is not likely to prevail on the merits on its breach of employment contract claim.

Innovative also claims that Marcell violated that provision of his employment contract that prohibited him from even preparing to compete against Innovative. Neither party has cited any Louisiana case interpreting such a clause in an employment contract. The undersigned is aware of no such case.

La. R.S. 23:921(A)(1) sets out the long-standing very strong public policy of the state disfavoring non-compete agreements. Section 921 does not address an agreement that purports to restrict *preparing* to compete. It seems obvious to the undersigned that if it is the strong public policy of the state to limit actual competition, the public policy of the state must be just as strong (or even stronger) prohibiting a limitation on preparing to compete.

■ Since there is no Louisiana statute which makes enforceable a contractual provision limiting the right to prepare to compete, I hold that the provision in this contract, which seeks to restrict even the right to prepare to compete, is unenforceable in Louisiana, based on the case law which predated the first authority for the enforcement of non-competition agreements in 1934. *See also SDT Industries, supra, and case law cited therein.*

Finally, the record reflects that Innovative breached its employment contract with Marcel (the same contract which it seeks to enforce against him), when it did not provide the incentives promised to him. The contract provides that Marcell would have the opportunity for bonuses, participation in a stock option plan and would be provided with a company vehicle and gas card. [Plaintiff's Exhibit 52]. However, Innovative never developed bonus criteria, a stock option plan, or provided a company car and gas card. [Tr. 21, 106–07, 621; Exhibit D79A, pp. 22–25]. While Marcell did receive some bonuses, they were not a matter of contract on which he could rely.

Because Innovative did not perform its contractual obligation, it cannot sue Marcell for his alleged breach of contract. *Fullerton v. Scarecrow Club, Inc.,* 440 So.2d 945, 949 (La.App. 2nd Cir.1983) (since plaintiff breached the contract and defendant did not, plaintiff could not seek contractual damages or specific performance under contractual provision for payment); *Marek v. McHardy,* 234 La. 841, 101 So.2d 689, 695 (1958) (physician was legally justified in treating contract breached when he was informed by defendants that they would repudiate their promise to give him a 10% interest in a medical partnership and, therefore, he was not required to continue in their service for a set time period as a condition precedent to the assertion of a damages claim);

*Schaumburg v. State Farm Mut. Auto. Ins. Co.,* 421 Fed.Appx. 434, 438 (5th Cir. 2011) (where a party refuses to comply with his contractual obligation, his refusal constitutes an active breach of the contract which relieves the other party of the obligation of continuing to perform under the contract.).

***Trademark Infringement***

Innovative asserts that Ironman infringed on its trademark by using the initials "IMS" when it began operations.

■ To recover on a claim of trademark infringement, a plaintiff must first show that the mark is legally protectable and must then establish infringement by showing a likelihood of confusion. *American Rice, Inc. v. Producers Rice Mill, Inc.,* 518 F.3d 321, 329 (5th Cir.2008). To be protectable, a mark must be distinctive, either inherently or by achieving secondary meaning in the mind of the public. *Id.* The Lanham Act, 15 U.S.C. § 1125 *et seq.,* provides a cause of action for infringement where one "uses (1) any reproduction, counterfeit, copy[,] or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution[,] or advertising of any goods; (5) where such use is likely to cause confusion, or to cause mistake or to deceive." *Id.* (*quoting Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap and Emblem Mfg.,* 510 F.2d 1004, 1009–10 (5th Cir.1975)).

■ The factors used by the Fifth Circuit in determining whether a likelihood of confusion exists are: (1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers. *Id.* (*citing Oreck Corp. v. U.S. Floor Systems,*

*Inc.*, 803 F.2d 166, 170 (5th Cir.1986)). The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported even by a majority of the factors. *Id.* (*citing Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir.1985)).

■ Innovative argues that the IMS logo which it used is protectable, and that Ironman's use of the letters "IMS" created confusion. However, the evidence shows that the initials IMS are used for a number of businesses, and not just staffing services, which are located in this geographic area. In fact, Ironman submitted several pages of entities which use "IMS" in its logo. [Defendant's Exhibit 8]. Under these circumstances, the undersigned does not find that the IMS logo is protectable.

■ Additionally, the evidence does not establish that Ironman's brief use of the initials IMS to describe its business created confusion. If likelihood of confusion exists, it must be based on the confusion of some relevant person, that is, a customer or purchaser. *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206 (1st Cir. 1983); *Electric Design & Sales, Inc. v. Electronic Data Systems Corp.*, 954 F.2d 713, 716 (Fed.Cir.1992).

■ Here, the three customers which Marcell brought with him to Ironman had a history of dealing with Marcell, both personally and professionally. Additionally, the record reflects that Ironman used the initials IMS for only a few weeks. Ironman changed the signage on its buildings, removed the logo from its business cards, had no company documents or letterhead containing these initials, and did not answer the phone as IMS. [Tr. 651–52]. Thus, it is unlikely that customers were confused when Marcell formed his own company and used the initials IMS for a brief period.

Accordingly, the undersigned finds that Innovative is unlikely to succeed on the merits of its claim for trademark infringement.

### 2. Irreparable harm

■ A preliminary injunction is an extraordinary and drastic remedy which should not issue except upon a showing of irreparable injury. *Anderson v. Douglas & Lomanson Co.*, 835 F.2d 128, 133 (5th Cir.1988) (*citing Enterprise International*, 762 F.2d at 472). Irreparable injury is harm that "cannot be undone through monetary damages," that is, harm for which money damages are inadequate or for which money damages are "especially difficult" to compute. *Deerfield Medical Center. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir.1981). The "central inquiry in deciding whether there is a substantial threat of irreparable harm to the plaintiff is whether the plaintiff's injury could be compensated by money damages." *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 810 n. 1 (5th Cir.1989).

■ Federal courts have long recognized that, when "the threatened harm is more than *de minimis*, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction." *Enterprise International*, 762 F.2d at 472 (*quoting Callaway*, 489 F.2d at 573). In short, "[t]he key word … is irreparable," and an "injury is 'irreparable' only if it cannot be undone through monetary remedies." *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir.1975) (*quoting Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958)). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.*

Thus, there can be no irreparable injury where money damages would adequately compensate a plaintiff. *Johnson*, 724 F.Supp.2d at 619 (*citing DFW Metro Line Services v. Southwestern Bell*, 901 F.2d 1267, 1269 (5th Cir.1990)).[6] Simply arguing that a company is losing customers and goodwill without showing that monetary damages are an inadequate remedy is insufficient to establish irreparable harm. *Id.; Millennium Restaurants Group, Incorporated v. City of Dallas*, 181 F.Supp.2d 659, 666 (N.D.Tex.2001); *Sun Water Systems, Inc. v. Vitasalus, Inc.*, 2007 WL 820280, *6 (N.D.Tex.2007).

Here, Innovative argues that defendants' actions have caused Innovative a loss of business goodwill and reputation that cannot be compensated by money damages. [rec. doc. 7, p. 22–24]. Additionally, Innovative argues that it will irreparably harmed due to Ironman's inability to satisfy a monetary judgment on resolution of this lawsuit. [rec. doc. 68, pp. 43–46].

Innovative argues that Marcell "gutted" the company by taking its employees and customers. However, the record reflects that following Marcell's resignation, Dumesnil personally spoke with the president of A & B, who indicated that A & B would be happy to continue doing business with Innovative. [Tr. 287]. Additionally, Dumesnil testified that he spoke to one of Bollinger's human resource managers, who indicated that Bollinger would be more than happy to continue its relationship with Innovative. [Tr. 289]. Further, Dumesnil reported that Innovative continues to receive requests from Bollinger for contract workers. *Id.*

In addition, the record reflects that after Marcell left, Innovative added one arms-length customer. [Tr. 107]. Also, since Marcell's departure, Innovative has recruited people to be contract workers. [Tr. 290]. Further, Dynamic's Human Resources Manager, Axel Vasquez, indicated that Innovative has hired, and is still hiring, contract workers. [Tr. 534]. In fact, Mr. Vasquez testified that following Marcell's resignation, Innovative hired 20 contract laborers to work for Helix in Texas, and the numbers were still growing. *Id.*

While a loss of a business' customers and damage to its goodwill are widely recognized as injuries incapable of ascertainment in monetary terms and may thus be irreparable (*see Allied Mktg. Group*, affirming the district court's holding that damage to goodwill was irreparable because it might be "incapable of calculation"), that is not the case here. *Johnson*, 724 F.Supp.2d at 626. The record reflects that since Marcell left, Innovative has continued to hire contract workers and sent them out to work for a new client. Thus, Innovative has failed to carry its burden of showing that it will suffer irreparable injury as a result of Marcell's actions.

Further, the record reflects that Innovative's alleged damages are capable of calculation. Where economic rights are involved, irreparable harm exists "when the nature of those rights makes establishment of the dollar value of the loss ... especially difficult or speculative." *Allied Mktg. Group, Inc.*, 878 F.2d at 810; *Block Corporation v. Nunez*, 2008 WL 1884012, *6 (N.D.Miss.2008). Here, Innovative has specifically alleged the exact amount of profits it lost as a result of Marcell's leaving the company. Dumesnil testified that that Innovative's value as of the date of Marcell's resignation, June 29, 2012, was $1.2 million annually. [Tr. 45]. Marcell

---

**6.** The Fifth Circuit has noted that "[o]ften times the concepts of 'irreparable injury' and 'no adequate remedy at law' are indistinguishable." *Tate v. American Tugs, Inc.*, 634 F.2d 869, 871 (5th Cir.1981) (*citing Lewis v. S.S. Baune*, 534 F.2d 1115, 1124 (5th Cir. 1976)).

testified that Innovative's projected revenue for 2012 was about $12 million, and the net profit generated was about $1.2 to $1.3 million. [Tr. 129–31]. Thus, these damages are not incalculable or speculative.

Thus, based on the record before this Court, the Court finds that Innovative has not successfully shown that money damages are insufficient compensation for any harm it has sustained, or that money damages are "especially difficult" to calculate. Accordingly, Innovative's damage, if any, does not rise to the irreparable harm level necessary for the extraordinary relief of a preliminary injunction. *See Block, Corp., supra.*

### PENDANT STATE LAW CLAIMS

Innovative asserts that this Court should exercise its supplemental jurisdiction over the state law claims in this case. In its Complaint, Innovative asserted six different causes of action, five of which arise under state law. The only claim brought under federal law is the alleged violation of section 43(a) of the Lanham Act.

■ It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The justification for supplemental jurisdiction lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. *Id.* Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. *Id.* Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. *Id.* Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals. *Id.*

■ In this case, the undersigned finds that Innovative's trademark infringement claim is weak, at best. Furthermore, since five of the six claims asserted by Innovative arise under state law, it is clear that state law issues substantially predominate. Finally, the state law claims predominate in terms of proof, in the scope of the issues raised and in the comprehensiveness of the remedies sought. The clear predominance of state law issues and the relative insignificance (and weak proof) of the federal claim, clearly favors declining to exercise supplemental jurisdiction in this case and dismissing the state law claims. 13D Fed. Prac. & Proc. Juris. § 35673 (3d ed.).

Accordingly, I recommend that the motion to dismiss be **GRANTED.**

### CONCLUSION

For the foregoing reasons:

**IT IS RECOMMENDED** that the Motion for Preliminary Injunction filed by Innovative Manpower Solutions, L.L.C. [rec. doc. 7] be **DENIED.**

**IT IS FURTHER RECOMMENDED** that the Motion to Dismiss Supplemental State Law Claims filed by Thaddeus Pete Marcell, Jr. and Ironman Staffing, L.L.C. [rec. doc. 17] be **GRANTED,** and that all state law claims filed against defendants be **DISMISSED WITHOUT PREJUDICE.**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk

of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR. *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3d 1415 (5TH CIR.1996).